UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| BIOCONVERGENCE LLC<br>   d/b/a SINGOTA SOLUTIONS,<br><br>         Plaintiff,<br><br>     v.<br><br>JASPREET ATTARIWALA,<br>SIMRANJIT JOHNNY SINGH<br>   a/k/a SIMRANJIT J. ATTARIWALA<br>   a/k/a SIM J. SINGH,<br><br>         Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:19-cv-01745-SEB-TAB |
| JASPREET ATTARIWALA,<br><br>         Counter Claimant,<br><br>     v.<br><br>BIOCONVERGENCE LLC,<br><br>         Counter Defendant. | ) ) ) ) ) ) ) ) ) ) ) |  |

## ORDER GRANTING PLANTIFF'S MOTION FOR FURTHER PRELIMINARY INJUNCTION [DKT. 84]

This cause is before the Court on Plaintiff's Motion for Further Preliminary

Injunction [Dkt. 84] filed on October 10, 2019. With that motion, Plaintiff

BioConvergence LLC d/b/a Singota Solutions ("Singota") seeks an order supplementing

an existing preliminary injunction entered by the Monroe Circuit Court I (Indiana) on

March 4, 2019. Singota specifically requests an order enjoining Defendant Jaspreet

1

Attariwala from working for her current employer and Singota's direct competitor, Emergent BioSolutions, Inc. ("Emergent"), as well as any other competitor based on alleged violations of the Indiana Uniform Trade Secrets Act. This matter was heard on two occasions by this court, on November 21, 2019, and December 4, 2019.

For the reasons detailed in this entry, Plaintiff's motion is **GRANTED.**

<u>Background</u>

The facts giving rise to this litigation are both prolix and labyrinthine; thankfully, they are largely undisputed by the parties.

**I.     The Parties**

Singota is a limited liability corporation based in Bloomington, Indiana. [Am. Compl. ¶ 17].  It operates as a contract development and manufacturing organization, sometimes referred to as a "CMO" or "CDMO," offering services for clients in pharmaceutical, animal health, and medical device industries. [*Id.* at ¶ 18]. Singota's services relate to sterile products that must be administered by injection, and Singota focuses its sterile-product capacity on primarily servicing clients with early-to-mid and late-stage research and development as well as commercial products that require small-scale capacity equipment [*Id.* at ¶ 19]. In serving its clients, Singota maintains highly confidential information with respect to its clients' products and is thus required to enter into client-specific confidentiality and disclosure agreements with strict terms governing Singota's storage, protection, and return of its clients' confidential product information. [*Id.* at ¶¶ 23-24].

Ms. Attariwala was first employed as a Senior Business Development Manager for Singota in September 2015. [*Id.* ¶ 27]. In this role, she was responsible for promoting Singota's business and generating new client projects. As a Senior Business Development Manager, she maintained access to Singota's confidential and proprietary information as well as Singota's clients' confidential and proprietary information. [*Id.* at ¶ 33].

As a condition of her employment with Singota, Ms. Attariwala executed an employment agreement in 2015 at the outset of her employment. [*Id.* at ¶ 27]. The employment agreement contained two restrictive covenants relevant to this litigation: a covenant not to solicit certain Singota clients and prospective clients, and a covenant not to use, disclose, or misappropriate Singota's confidential information. The non-disclosure provision specifically provides:

> Employee (i) shall use Confidential Information solely in connection with Employee's employment with the Company; (ii) shall not directly or indirectly disclose, use or exploit any Confidential Information for Employee's own benefit or the benefit of any other person or entity, other than the Company, both during and after Employee's employment with the Company or as required by law; and (iii) shall hold Confidential Information in trust and confidence, and use all reasonable means to assure that it is not directly or indirectly disclosed to or copied by unauthorized persons or used in an unauthorized manner, both during and after Employee's employment with the Company.

[Am. Compl., Exh. A]. The agreement defines confidential information as:

> [A]ny proprietary, confidential, or company-sensitive information and materials which are the property of or relate to the Company or business of the Company. Confidential Information shall include without limitation all information and materials created by, provided to, or otherwise disclosed to Employee in connection with Employee's employment with the Company (excepting only information and materials already known by the general public), including without limitation (i) trade secrets, (ii) the names and addresses of the Company's past, present or prospective contributors, beneficiaries or business contacts, and all information relating to such contributors, beneficiaries, or business contacts,

regardless of whether such information was supplied or produced by the Company or such contributors, beneficiaries, or business contacts; and (iii) information concerning the Company's affiliates, financing sources, profits, revenues, financial condition, fund raising activity, and investment activity, business strategies, and software used by the Company and associated layouts, templates, processes, documentation, databases, designs and techniques.

[*Id.*] The non-solicitation provision states:

> During Employee's employment with the Company and for a period of twelve (12) months (which shall be extended by the length of any period during which Employee is in violation of this section) immediately following the termination of Employee's employment for any reason, Employee (on Employee's own behalf or that of any other person or entity) shall not directly or indirectly sell or otherwise provide or solicit the sale or provision of any product or service that competes directly or indirectly with any business of the Company to any customer or prospective customer or prospective customer as to which, during the 12 months immediately preceding the date of termination, Employee (i) engaged in any solicitation, sales activity, or other direct contact (in person, in writing, by telephone or electronically) on behalf of the Company; (ii) performed any duties or services on behalf of the Company; and/or (iii) received any Confidential Information.

[*Id.*].

## II. Ms. Attariwala's Departure from Singota and Commencement of Employment with Emergent

In October 2018, Ms. Attariwala undertook negotiations with Emergent, a direct competitor of Singota, regarding her potential employment with that company. [Dkt. 85, Exh. A.] She ultimately accepted an offer from Emergent as a Senior Manager on December 11, 2018 and submitted her resignation to Singota on December 19, 2018. [Dkt. 85, at 7, 8]. She officially departed Singota later that month[1] and commenced her employment with Emergent on February 11, 2019. [*Id.* at 9, 13].

---

[1] It is unclear what precise date Ms. Attariwala left her employment with Singota.

Following Ms. Attariwala's departure, Singota began to suspect that Ms. Attariwala had breached the restrictive covenants of her employment agreement. [*Id.* at 10]. In late-December 2018, a review of Ms. Attariwala's email revealed that she been in contact with Singota's current and prospective clients to inform them of her transition to Emergent. She further notified these clients that she would be in contact with them in January once she settled into her new position. [*Id.*]. She also shared information about Emergent's aseptic filling capabilities with at least one of these clients. [*Id.*]

Upon discovering these communications, Singota issued a cease and desist letter to Ms. Attariwala demanding that she comply with the terms of her employment agreement and that she immediately disclose to them any confidential or proprietary information that she had accessed following her departure. [*Id.* at 10-11, Exh. A]. Singota requested that Ms. Attariwala provide assurances, under oath, identifying said information and describing any use thereof. [*Id.*] The parties participated in ongoing discussions in an attempt to informally resolve these disputes, but without avail; Ms. Attariwala denied any improper communications with clients and would not provide Singota with any requested assurances. [Dkt. 85, at 12; Am. Compl. ¶ 42].

Sometime in February 2019, an analysis of Ms. Attariwala's Singota email data revealed that Ms. Attariwala had, on the same day she had accepted employment with Emergent, forwarded large amounts of Singota's confidential information to her personal email address, including a memorandum discussing Singota's aseptic manufacturing capabilities as well as information about Singota's clients, prospective clients, contact lists, internal processes, technology, and business practices. [Dkt. 85, at 13]. Singota also

discovered that Ms. Attariwala, while in negotiations with Emergent, had forwarded a prospective client opportunity, which she had received on behalf of Singota, to her personal email account and to her future supervisor at Emergent. [*Id.*, at 7].

These discoveries prompted Singota to file suit against Ms. Attariwala in the Monroe Circuit Court I (Indiana) on February 27, 2019, and seek a temporary restraining order and preliminary injunction. [*Id.* at 14].

## III.    State Court Proceedings

### a.  *State Court Enjoins Ms. Attariwala*

On February 28, 2019, the state court entered a Temporary Restraining Order against Ms. Attariwala:

> 1) Enjoining Ms. Attariwala from having in her possession, custody, or control and from directly or indirectly using the Company's trade secrets, confidential information, protected information, and other property;
>
> (2) Prohibiting Ms. Attariwala from breaching her Employment Agreement by directly or indirectly communicating with or servicing the Company's clients and prospective clients;
>
> (3) Requiring Ms. Attariwala to return to the Company all confidential information, protected information, and other property that she took or copied from the Company, including from all email accounts, computer hardware or software, and other electronic storage media, and for independent verification of her compliance with these requirements

[Dkt. 85, Exh. D]. The state court contemporaneously issued a preservation order requiring Ms. Attariwala to "preserve all potentially relevant evidence in this case, including expressly electronically stored data in her possession, custody, or control relating to Singota, including emails or data [.]" [Dkt. 4-1, at 86].

The state court conducted preliminary injunction hearings on March 1, 2019 and March 4, 2019. Following these hearings, the state court entered a stipulated preliminary injunction requiring Ms. Attariwala and all those acting in concert with her to:

- avoid directly or indirectly disclosing, using, or exploiting Singota's "Confidential Information" and to hold such Confidential Information in trust and confidence until it could be returned to Singota;

- turn over all documents, data, devices, storage media, and other property belonging to Singota;

- avoid directly or indirectly destroying, erasing, or otherwise making unavailable any such documents, data, devices, storage media, etc.

- within twenty-four (24) hours, make all computers, hard drives, storage media, email and cloud accounts, cell phones, and other devices available to Singota's forensic expert, Ms. Rebecca Green;

- not attempt to reconstitute, recover, or in any way restore any of the Confidential Information returned to Singota pursuant to the preliminary injunction;

- and comply with all other restrictive covenants in her employment agreement.

[Dkt. 85, Exh. F]. The state court simultaneously issued an Order for Inspection of Computers and Electronic Information Storage Devices (the "Inspection Order) detailing specific protocols to ensure that Ms. Attariwala produce for inspection all accounts and devices that could contain Singota information. [Dkt. 85, Exh. G]. The Inspection Order, in conjunction with the preliminary injunction, ordered Ms. Attariwala, and all those acting in concert with her, to produce for inspection all computers, hard drives, electronic storage devices, email or cloud accounts, phones, and tablets used to store electronic information within her possession, custody, or control. [*Id.*]. Ms. Attariwala, and all those

acting in concert with her, were also ordered to produce all documents, data and materials which contained confidential information; all documents, products, notes, or materials connected with or arising out Ms. Attariwala's employment with Singota; any computer, software, phone, or other device provided by the company; and any security devices related to Singota. [*Id.*]

Ms. Attariwala was to produce the specified accounts and devices with 24 hours following the issuance of the injunction and to immediately cease accessing any account or device that contained Singota's confidential information. She was explicitly ordered not to access any storage location where Singota's information may be contained until Ms. Green's examination of the particular location was completed. Finally, the Inspection Order detailed terms and conditions by which Ms. Green was to inspect the accounts and devices. [*Id.*].

At the conclusion of the preliminary injunction hearings, the state court further determined that Ms. Attariwala should bear the costs of Ms. Green's forensic work anticipated in the stipulated preliminary injunction and the Inspection Order. The state court memorialized this decision in a written order dated March 18, 2019 (the "Expenses Order"). [Dkt. 85, Exh. H].

### b. *Ms. Green's March 2019 Inspections*

Following the entry of the state court's stipulated preliminary injunction and Inspection Order, Ms. Attariwala produced several accounts and devices,[2] including her personal computer, iPhone, and iPad, and her husband's MacBook computer. [Dkt. 85, at 17-19; Exh. B, ¶ 215]. At that time, Singota, while it did not yet know the full extent of the documents taken and potentially shared by Ms. Attariwala, Singota believed that Ms. Attariwala's purported production of all accounts and devices in her possession would enable Ms. Green to efficiently complete her inspection and remove any risk of misappropriation of Singota's confidential information and trade secrets.

However, as Ms. Green commenced her inspections in March 2019, she soon realized that the scope of the required inspection was exponentially greater than the parties had contemplated when they entered into their stipulated preliminary injunction. [Dkt. 85, Exh. B at 16]. Ms. Green's initial review of Mr. Attariwala's MacBook, for example, produced more than 10,000 "hits" for the search terms "Singota, BioConvergence, and BioC," and Ms. Attariwala's iPhone produced over 3000 hits. Ms. Green also discovered fourteen email and cloud accounts with over three million emails that could potentially contain Singota's confidential information. These accounts, once uncovered by Ms. Green, led to the discovery that Ms. Attariwala had emailed Singota documents to accounts that were never disclosed and connected various accounts and

---

[2] As Singota notes, these initial accounts and devices were not produced in the timeframe ordered by the state court. Several devices were produced within days or weeks, while others were not disclosed until months later. Some, apparently, not at all.

devices to those devices containing Singota's confidential information [*Id.* at 16-21]. Ms. Green also discovered the transmittal of Singota data through email accounts that Ms. Attariwala had represented as not containing any confidential information of Singota's.

Ms. Green further determined that Ms. Attariwala had backed up her iPhone to an undisclosed iCloud account on the same day the stipulated preliminary injunction was entered and had accessed at least one email account likely containing Singota data at the same time Ms. Green was conducting her analysis, all in contravention of the state court orders. Ms. Attariwala admitted deleting an unknown number of Singota data from her personal email account, despite the state court's preservation order. [*Id.* at 10-19].

Finally, around this same time, Ms. Green discovered that, within three minutes of accepting her job offer with Emergent, Ms. Attariwala generated six reports containing confidential records relating to hundreds of Singota's clients and prospective clients.[3] [*Id.* at 12].

### c. The State Court's Contempt Proceedings

On April 14, 2019, Singota filed its Motion to Show Cause Why Defendant Should Not Be Found in Contempt, asserting that Ms. Attariwala was in violation of the preliminary injunction, the Inspection Order, and the Expenses Order. [Dkt. 85, at 18]. Singota alleged that Ms. Attariwala had failed to provide accurate account access information for various email and cloud accounts, many of which she had not disclosed, and had failed to produce several devices believed to contain Singota's confidential

---

[3] It is unclear when Ms. Green made this discovery. Counsel for Singota estimated sometime in March 2019, although this discovery is not a basis for Singota's contempt motion.

information. Singota reported that it had exhausted its efforts to resolve the issues voluntarily with Ms. Attariwala, and that Ms. Attariwala's repeated obstruction substantially hindered Ms. Green's ability to identify and recover Singota's confidential information and determine how it may have been copied, shared, or otherwise used.  Ms. Attariwala also had not paid Ms. Green's expenses, as ordered. [Dkt. 85, Exh. I].

The state court granted the Motion to Show Cause and ordered Ms. Attariwala to immediately comply with the Expenses Order. The state court held a show cause hearing on April 17-18, 2019. After permitting Ms. Attariwala to participate via video conference on April 17, 2019, the court commanded that she appear in person on April 18, 2019 and bring with her every device and account containing Singota's allegedly stolen information.  The court threatened Ms. Attariwala with contempt if she failed to do so. [Dkt. 85, at 19]. When Ms. Attariwala did not appear on April 18, 2019, and made no attempt to connect telephonically or continue the hearing, the state court orally found her in contempt for failing to appear and issued a writ of attachment for Ms. Attariwala until she complied with the state court's orders. The state court also ordered Ms. Attariwala to immediately pay Ms. Green's outstanding expenses, totaling $55,000. To date, Ms. Attariwala has not paid any of Ms. Green's expenses, with the exception of $5000 advanced upon entry of the state court's preliminary injunction. [Dkt. 85, at 20-22].

## IV.    Ms. Attariwala's Removal to Federal Court

### a.  This Court's Jurisdiction to Adjudicate this Matter

On April 30, 2019, Ms. Attariwala removed this case to federal court, purportedly based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332. [Dkt. 1].

Per the Notice of Removal, the amount in controversy was undetermined, rendering the case non-removeable, prior to the date of the state court contempt proceedings on April 17-18, 2019. On May 9, 2019, we determined that Ms. Attariwala had not properly alleged Singota's (a limited liability company) citizenship in the Notice of Removal and ordered the filing of an amended notice of removal properly establishing diversity jurisdiction, if possible.[4] [Dkt. 14]. On June 7, 2019, Ms. Attariwala filed an amended notice of removal, which properly alleged Singota's citizenship by including the citizenship of each of its members, all of whom are diverse to Ms. Attariwala [Dkt. 25]; thus, Ms. Attariwala satisfied the requirements for diversity jurisdiction.

In the interim, on May 23, 2019, Singota filed a Motion for Leave to File Amended Complaint. Singota stated that the Amended Complaint contained federal questions that "would resolve the outstanding question regarding this Court's subject matter jurisdiction by establishing federal question jurisdiction." [Dkt. 22]. We granted Singota's Motion for Leave on June 17, 2019, [Dkt. 29] and the Amended Complaint was filed on June 18, 2019. [Dkt. 30]. The Complaint now includes claims for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Computer Fraud Abuse Act, 18 U.S.C. § 1030.

---

[4] "Courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). A court "must raise the issue *sua sponte* when it appears that subject matter jurisdiction is lacking." *Buethe v. Britt Airlines*, 749 F.2d 1235, 1238 (7th Cir. 1984); *see also Evergreen Square of Budahy v. Wis. House. & Exon. Dev. Auth.*, 776 F.3d. 463, 465 (7th Cir. 2015).

The Seventh Circuit has held that if a plaintiff amends an improperly-removed complaint to invoke subject matter jurisdiction by adding a federal question, for example, the district court has subject matter jurisdiction over the matter. *Bernstein v. Lind-Waldock & Co.*, 738 F.2d 179 (7th Cir. 1984) (*cited affirmatively in GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 638 (7th Cir. 2013); *see also Morlan v. Universal Guar. Life Ins. Co.*, 298 F.3d 609, 617 (7th Cir. 2002) ("[T]he filing of the amended complaint was the equivalent of filing a new suit, and so it wouldn't matter had there been no jurisdiction over [the] original suit.").

Accordingly, we hold that this Complaint properly invokes our subject matter jurisdiction, pursuant to both 28 U.S.C. §§ 1331 and 1332.

Having established subject matter jurisdiction to adjudicate the claims against Ms. Attariwala, we next examined our authority to execute and/or alter the state court's preliminary injunction. Title 28 U.S.C. § 1450 provides that "[a]ll injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." Although the Seventh Circuit has not weighed in on this specific issue, district courts, including those in our circuit, have generally interpreted 28 U.S.C. § 1450 as impliedly authorizing a district court to set aside or modify a state court's preliminary injunction. *Werner v. Bd. of Educ. of Pope Cty. Cmty. Unit Sch. Dist. No. 1*, No. 3:11-CV-01095-JPG, 2012 WL 1134006, at *2 (S.D. Ill. Apr. 4, 2012); *Napleton Auto Werks, Inc. v. Auto. Mech.'s Local No. 701*, No. 2:06 CV 160, 2006 WL 1128653, at *1 (N.D. Ind. Apr. 26, 2006); *In re RBGSC Inv. Corp.*, 253 B.R. 369, 384 (E.D. Pa. 2000) (*overruled on other grounds*); *Clio*

*Convalescent Ctr. v. Michigan Dep't of Consumer & Indus. Servs.*, 66 F. Supp. 2d 875, 877 (E.D. Mich. 1999); *see also Heidel v. Voight*, 456 F. Supp. 959 (E.D. Wisc. 1978).

Following this guidance, we have taken up this "where the state court left it off" and "accept the case in its posture as though everything done in state court had in fact been done in the federal court." *Napleton Auto Werks, Inc.*, 2006 WL 1128653, at *1.

### b. Magistrate Judge Baker's Vacatur of the State Court's Contempt Order

On May 6, 2019, following the arrival of this case on our docket, the state court issued a written Order on the Motion to Show Cause, [Dkt. 85, Exh. L], concluding that Ms. Attariwala had violated the preliminary injunction order as well as the inspection and expenses orders. The state court further held that Ms. Attariwala had intentionally obstructed the litigation and Singota's ability to recover its confidential information. Having also determined that Ms. Attariwala's conduct warranted "severe sanctions," the state court entered a declaratory judgment against Ms. Attariwala and dismissed Ms. Attariwala's counterclaim with prejudice. [*Id.*].

Upon Ms. Attariwala's motion, Magistrate Judge Baker vacated the state court's Order on the Motion to Show Cause, ruling that the state court did not have jurisdiction to enter the order once the case had been removed to federal court. [Dkt. 91]. Judge Baker denied as moot Ms. Attariwala's request to vacate the bench warrant, concluding that it had expired on its own terms on October 15, 2019. [*Id.*].

*c. Ms. Green's Post-Removal Discoveries*

Following removal to federal court, Ms. Green's inspections as well as her discoveries of inculpatory evidence continued. Of particular concern, says Singota, were the recently discovered acts that occurred during Ms. Attariwala's final week of employment at Singota.

Specifically, sometime in September or October 2019, Ms. Green discovered that, within four minutes of accepting her position at Emergent in December 2018, Ms. Attariwala created a folder on her Singota tablet entitled "Jessie Docs."[5] [Dkt. 85, Exh. B. ¶¶ 37-39]. Ms. Attariwala had retrieved the six customer reports that she had generated immediately upon accepting her position with Emergent and copied them to the "Jessie docs" folder. [Dkt. 85, Exh. B ¶¶ 41-45]. Over the course of Ms. Attariwala's final days at Singota, she continued to copy confidential Singota documents into the "Jessie docs" folder: On December 19, 2018, the day Ms. Attariwala submitted her resignation to Singota, Ms. Attariwala made copies of her Singota email account's inbox and sent folders, creating .pst files[6] of the emails which she then saved in the "Jessie docs" folder. In so doing, Ms. Attariwala had transferred and saved a total of more than 10,000 emails, nearly 5000 of which included at least one attachment. Included within these emails and attachments were Singota's confidential materials including its engineering

---

[5] Ms. Attariwala's nickname is Jessie.
[6] These files enable someone to store items, such as emails, initially created in Microsoft Outlook.

specifications, client manufacturing questionnaires, manufacturing timelines, and more. [Dkt. 85, Exh. B ¶¶ 71-73, 77, 78].

Ms. Green's analysis further revealed that Ms. Attariwala repeatedly copied the "Jessie docs" folder, with all of the aforementioned contents. [Dkt. 85, Exh. B ¶¶ 74-80]. On the evening of December 19, 2018, Ms. Attariwala copied the "Jessie docs" folder from her Singota tablet to an External Seagate hard drive. An analysis of this hard drive by Ms. Green uncovered over 250 additional confidential Singota documents including business development opportunities, client contact lists, detailed lead spreadsheets, manufacturing techniques, and more. [Dkt. 85, Exh. B ¶ 48]. Later that same night, Ms. Attariwala copied the "Jessie docs" folder from the hard drive to her personal table and on that same day, Ms. Attariwala, using her Singota tablet, created a cloud-based document entitled "Leads – Emergent." In her final days at Singota, Ms. Attariwala also copied additional information from Singota's files onto the "Leads – Emergent" document. [Dkt. 85, Exh. B ¶¶ 53-70].

On February 27, 2019, within hours following Singota's initiation of this litigation on February 27, 2019, Ms. Attariwala copied the entire contents of the "Jessie docs" folder from her personal tablet to a location that has yet to be disclosed or discovered. And, within the same moment that she made this copy, she accessed a Microsoft OneDrive[7] account from her personal tablet. [Dkt. 85, Exh. B ¶¶ 191-197]. This Microsoft OneDrive account also has never been disclosed or produced to Singota. Ms.

---

[7] OneDrive is a cloud-based account that can be used to save large amounts of data and can be accessed from any devices with an internet connection.

Green has continued to discover other undisclosed email or online storage accounts, including accounts belonging to Ms. Attariwala's husband, that have either been the repositories of Singota information in some form, or have been connected to or accessed on an account or device containing the stolen Singota information. [Dkt. 111-1, ¶ 17]. Meanwhile, though Ms. Attariwala has asserted on multiple occasions that she has produced everything, additional accounts and devices are later uncovered. [Dkt. 111-1, ¶ 12].

Finally, Ms. Green's analysis also shows that Ms. Attariwala has accessed at least some of Singota's stolen information following her commencement of employment with Emergent. [Dkt. 85, Exh. B ¶¶ 169-178, 182-188].

Importantly, Ms. Attiariwala does not dispute any of Ms. Green's investigatory findings. However, counsel for Ms. Attariwala has simply asserted, in response, as he did at the November 21, 2019, hearing, that Ms. Attariwala did not take the disputed Singota documents with the malicious intent of using them for the benefit of her new employer. Rather, he said, she sought to preserve the documents as evidence in a looming wage dispute between herself and Singota. As will be discussed hereafter, Ms. Attariwala does refute certain allegations that she has been noncompliant in ensuring the return of Singota's confidential information and trade secrets.

### d. Singota's Request for Expanded Injunctive Relief

Singota's current request turns on its claim and the uncontroverted evidence that Ms. Attariwala has violated and continues to violate the Indiana Uniform Trade Secrets Act ("IUTSA"), Ind. Code. § 24-2-3-1 (2019), as well as the state court's orders. At the

hearings on its motion, Singota has stressed that it did not wish to alter the state court's preliminary injunction except to supplement it. As Singota argues, Ms. Attariwala's misconduct and noncompliance have prevented the state court's preliminary injunction from ensuring that Singota's confidential information and trade secrets are recovered. Because Ms. Attariwala has not been forthright in disclosing the documents she apprehended nor where or with whom she has shared them, and that she has wantonly violated the state court's injunctive order, Singota seeks greater protection to ensure that its confidential information is not improperly disclosed or used to its economic detriment.

The parties first appeared before our Court on November 21, 2019,[8] wherein, following an extensive colloquy with both counsel, the Court recessed the proceedings to allow the parties to discuss a potential resolution of their disputes. Following their private discussions, the parties indicated that some progress had been made, although no firm solution had been reached. Singota agreed to provide a definitive list of the outstanding devices and accounts that it sought to inspect, and the parties committed to continue negotiations respecting the manner, means, and time of the next round up, whereupon the Court adjourned the conference. A reconvened hearing was set for December 4, 2019, should the parties need the Court's assistance.

---

[8] On the evening before the November 21, 2019 hearing, Ms. Attariwala submitted additional evidentiary materials. Singota moved to strike the submissions, arguing that they were untimely per local rules and that counsel did not have adequate time to review the documents in advance of the hearing. [Dkt. 102]. Given the ongoing nature of the hearings on Singota's motion as well as the Court's nonreliance on these evidentiary submissions, Singota's Motion to Strike is **denied as moot.**

When the parties were unable to resolve the dispute, the Court again convened for a renewed hearing on December 4, 2019. Per the Court's prior directive, Singota submitted a detailed list (to opposing counsel and the Court) identifying all outstanding storage accounts and devices that it needed to inspect. [Dkt. 111-1]. The parties also requested a ruling by the Court on Singota's Motion for Preliminary Injunction.[9]

## Analysis

### I.      Standard of Review

A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*,

---

[9] The issue presents whether the non-solicitation provision of the parties' employment agreement will expire in December 2019 as referenced in the contract. This question has never been fully briefed or argued by the parties. As explicated in our Order on Singota's motion, the terms of the state court's preliminary injunction, including the provision mandating Ms. Attariwala's compliance with the restrictive covenants in the employment agreement, remain in full force and effect for so long as this action is pending or until such time that the Court determines that the preliminary injunction, or any portions thereof, may be lifted. In other words, Ms. Attariwala must abide by these restrictive covenants until otherwise directed by the Court. This has the effect of extending the employment agreement beyond December 2019.

549 F.3d 1079, 1086 (7th Cir. 2008) (*citing Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)).

However, if these threshold conditions are met, the Court must then assess the balance of harms—the harm to Singota, if the injunction does not issue, against the harm to Ms. Attariwala if it does issue—and determine the impact of an injunction on the public interest. *Id.* "The more likely it is that [the moving party] will win [its] case on the merits, the less the balance of harms need weigh in [its] favor." *Id.*

## II.     Likelihood of Success on the Merits

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on his claims are 'better than negligible.'" *Valencia v. City of Springfield, Illinois*, 83 F.3D 959, 966 (7th Cir. 2018) (*quoting Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017)). This is a low threshold, and we need not be certain about the outcome of the case just yet. *Id.*

With only minimal resistance from Ms. Attariwala, we can swiftly conclude that the evidence supports a finding of a reasonable likelihood of success on the merits of Singota's IUTSA claim.

Singota alleges, and Ms. Attariwala has not disputed, that she departed from Singota with an extraordinary amount of its confidential documents in tow, many of which matters were of economic value to Singota and the subject of reasonable efforts to maintain their secrecy. In these circumstances, Indiana courts have consistently found a

reasonable likelihood that the IUTSA was violated. *Badger Daylighting Corp. v. Palmer*, No. 1:19-CV-02106-SEB-MJD, 2019 WL 4572798, at *8 (S.D. Ind. Sept. 20, 2019); *Toyota Indus. Equip. Mfg., Inc. v. Land*, No. 1:14-CV-1049-JMS-TAB, 2014 WL 3670133, at *1 (S.D. Ind. July 21, 2014); *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507 (Ind. 1995); *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 181 (Ind. Ct. App. 2007); *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.*, 826 N.E. 2d 49, 59 (Ind. Ct. App. 2005); *Hydraulic Exchange and Repair v. KM*, 690 N.E.2d 782 (Ind. Ct. App. 1998).

To determine whether Ms. Attariwala's conduct necessitates Singota's requested injunctive relief, we first analyze whether the downloaded documents she admittedly wrongfully seized deserve protection as trade secrets under Indiana law. A protectable trade secret possesses four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy. Ind. Code § 24-2-3-2 (2019). The IUTSA provides that "actual or threatened misappropriation" of trade secrets may be enjoined. Ind. Code § 24-2-3-3(a) (2019). Misappropriation, in relevant part, means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:
> > (A) used improper means to acquire knowledge of the trade secret;
> > (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:
> > > (i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . .

Ind. Code § 24-2-3-2 (2019).

Singota has provided a detailed analysis of the documents that it maintains Ms. Attariwala improperly acquired; has discussed the proprietary value of these documents; and outlined its business practices employed to keep the documents secrets. In sum, the allegedly stolen documents include: confidential information relating to Singota's clients' products; client contact information; client project plans; manufacturing timelines and estimates; engineering specifications; daily operation reports; supply chain documents; and much more.

Indiana courts have generally held that several of the identified categories of documentation qualify as trade secrets when they are subject to reasonable efforts, such as those employed by Singota, to maintain their secrecy or keep them from becoming ascertainable to the general public. *Toyota Indus. Equipment Mfg., Inc. v. Land*, 2014 WL 3670133, at * 3 (characterizing customer information, financial data documents, organizational charts, and product specifications as confidential information and trade secrets); *AL-KO Axis, Inc. v. Revelino*, No. 3:13-CV-1002 JD, 2013 WL 12309288, at *15 (N.D. Ind. Oct. 24, 2013) (recognizing product development details and strategies, financial strategies, and marketing strategies as trade secrets); N.D. Ind. Oct. 25, 2013); *U.S. Land Services, Inc. U.S. Surveyor, Inc.*, 826. N.E.2d at 60 (qualifying customers lists and databases as trade secrets when they contained substantial information about

customers and prospective clients); *Star Sci., Inc. v. Carter*, 204 F.R.D. 410, 414 (S.D. Ind. 2001) (concluding that customer lists and pricing information are protectable trade secrets).

We stress that Ms. Attariwala does not dispute either the accuracy of Singota's reporting or the importance of the materials or the reasonableness of Singota's efforts to maintain the secrecy of these documents, nor does she dispute that Indiana law consistently recognizes these types of documents as trade secrets.[10]

Given the uncontested legal precedent supporting Singota's position that the purloined documents qualify as trade secrets, we are satisfied that Singota has shown a reasonable likelihood of proving that at least some of the documents confiscated by Ms. Attariwala qualify as trade secrets. Accordingly, we turn next to assess whether Ms. Attariwala's actions have given rise to a risk of misappropriation of Singota's trade secrets that warrants a finding that Singota has a reasonable likelihood of success on the merits of this legal claim. Ms. Attariwala and her counsel did not counter, either through the briefing on this motion or at the hearings, Singota's averment that the circumstances have created a risk of misappropriation.[11]

---

[10] On November 27, 2019, Singota moved to continue a settlement conference scheduled for December 13, 2019. In her opposition brief, Ms. Attariwala stated: "It is questionable whether [the Leads – Emergent file] is even entitled to trade secret information." No support for this assertion is provided. This is the first and only time to our knowledge that Ms. Attariwala has questioned the trade secret nature of the disputed documents. Because Ms. Attariwala only questions one file out of thousands and never presents a legal analysis for even that one file, we do not credit her seemingly offhanded remark.

[11] Ms. Attariwala does argue that the circumstances present no greater risk of disclosure now than that which existed at the time of the state court's proceedings when the parties agreed to the entry of the stipulated preliminary injunction. Thus, she argues, further injunctive relief is not

Because Ms. Attariwala had never denied her alleged misconduct, nor persuasively disputed Singota's categorization of the stolen documents as trade secrets, nor asserted that Singota's trade secrets are not at risk of misappropriation, it was a surprise to discover defense counsel's contention in its December 11, 2019, proposed order that Singota had not shown a likelihood of success on the merits of its IUTSA claim. This is the first instance in which Ms. Attariwala specifically asserts that Singota has not fulfilled this element as a precondition to its entitlement to injunctive relief.

Ms. Attariwala now argues that Singota "must show that she took protected trade secret information in order to gain a competitive advantage against her employer" in order to prevail on its IUTSA claim. Because Ms. Attariwala "took certain information to preserve evidentiary support for her wage claim against Singota" and not to "unfairly compete," counsel contends that Singota cannot show she took the disputed documents "for her own economic advantage," thus defeating Singota's IUTSA claim. Ms. Attariwala's counsel provides no legal authority for her theory that there is a malice element embodied within the IUTSA. The Court located no such authority. To the contrary, whether a defendant took trade secrets for a malicious purpose is not determinative of whether or when an injunction is appropriate under the IUTSA. *Vickery v. Ardagh Glass Inc*., 85 N.E.3d 852, 864 (Ind. Ct. App.), *reh'g denied*, 95 N.E.3d 213 (Ind. Ct. App. 2017), *and transfer denied*, 98 N.E.3d 71 (Ind. 2018). The relevant inquiry,

---

necessary. We will follow Ms. Attariwala's lead by addressing this argument within the context of irreparable harm.

as contemplated in the IUTSA, is whether the circumstances at hand create a risk of unauthorized disclosure. *Id*; *See also Ackerman v. Kimball Int'l, Inc*., 652 N.E.2d at 509.

As many courts, including this one, have concluded: "[A]n employee who illicitly takes and retains [her] employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of [its] legal claim[]." *Badger,* 2019 WL 4572798, at *10. *See also Toyota Indus. Equip. Mfg., Inc. v. Land*, 2014 WL 3670133, at *1; *Ackerman v. Kimball Int'l, Inc*., 652 N.E.2d at 507; *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d at 181; *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.*, 826 N.E. 2d at 59; *Hydraulic Exchange and Repair v. KM*, 690 N.E.2d at 782.

Defendant maintains, again without citation to any legal authority, that because Singota has not presented any evidence that Ms. Attariwala has used its information for the benefit of her new employer,[12] the likelihood of success on the IUTSA claim is diminished. However, we say again, evidence of use or misuse of the information is not a prerequisite for an injunction pursuant to the IUTSA. While Ms. Attariwala's counsel has ignored those cases holding that a defendant's improper taking of its employer's trade secrets, and subsequent retention thereof, created a reasonable likelihood of success on the merits of the plaintiff's IUTSA claim, even in the absence of evidence of actual use,

---

[12] Imbedded in this argument is Ms. Attariwala's claim that "there is no evidence a client has left Singota, or has even been solicited to leave, as a result." However, Singota's concerns about the disclosure of its documents, which include confidential manufacturing details, engineering specifications, and operational reports, extend far beyond its solicitation concerns.

we cannot and will not ignore them. *Toyota Indus. Equip. Mfg., Inc. v. Land*, 2014 WL 3670133, at *1; *Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d at 507.

Finally, Ms. Attariwala's counsel asserts that Singota's "mischaracterization of Ms. Attariwala's deposition testimony" undercuts its likelihood of success in this litigation because "equity generally prohibits one with unclean hands from obtaining relief." When or how Singota "mischaracterized" Ms. Attariwala's deposition testimony goes unexplained by Ms. Attariwala's counsel. In any event, Singota's position does not turn on the deposition testimony presented by Singota, nor will the Court's decision.

Singota has successfully established a reasonable likelihood of prevailing on the merits of its IUTSA claim, satisfying the first prong of entitlement to injunctive relief.

## III.     Irreparable Harm & Inadequate Remedy at Law

The heart of the parties' substantive dispute at this juncture is not whether the circumstances outlined here with regard to Ms. Attariwala's taking and retention of documents belonging to Singota could result in irreparable harm for which there is no adequate remedy at law—precedent clearly instructs that they do.[13] This issue before us is a procedural one: whether the state court's existing preliminary injunction adequately insulates Singota from irreparable harm.

---

[13] Ms. Attariwala's "pre-departure harvesting" of Singota's proprietary information compounds the threat of misuse and misappropriation that could likely result in irreparable harm to Singota for which there is no remedy at law. *Ackerman*, 652, N.E.2d at 510-11 (*quoted in Badger*, 2019 WL 4572798, at *8, *Toyota*, 2013 WL 3670133, at *8). Ms. Attariwala does not challenge this case law or its application here.

From Singota's perspective, the state court's preliminary injunction is insufficient, given the course of this litigation since those orders were entered. First, Ms. Attariwala has shown herself unwilling to comply with the state court's orders, including its preliminary injunction. Ms. Attariwala has deleted documents in violation of the preservation order, accessed accounts subject to Ms. Green's inspection despite explicit orders not to, failed to report the specific information she took, misrepresented the location of documents, and failed to disclose relevant accounts and devices. Ms. Attariwala's blatant failures to cooperate with the terms of the state court's preliminary injunction has increased the extent of the harm Singota faces to a point of irreparability much greater and more serious than it could have foreseen at the time it negotiated the stipulated preliminary injunction in state court.

Ms. Attariwala responds by arguing that the state court's preliminary injunction was crafted by the parties, with Singota's input, and Singota should have broadened its terms at that time to include the requests now being advanced if it believed they were necessary. Ms. Attariwala also asserts that the arguably most egregious of her alleged wrongdoings—creating the "Jessie docs folder and copying it repeatedly, for example— occurred *before* the entry of the state court's preliminary injunction. There has been no change in her conduct or the circumstances giving rise this lawsuit since entry of the state court's preliminary injunction, she stresses. Thus, no alteration to that order is warranted, according to Ms. Attariwala.[14]

---

[14] Ms. Attariwala also argues that Singota's delay in demanding an expanded injunction undermines any claim of irreparable harm. She states that Singota cannot establish irreparable

Ms. Attariwala's argument fails to address Singota's claim that it did not know when it entered into the stipulated preliminary injunction what it knows now. What it has discovered since that time is that Ms. Attariwala left Singota with *thousands* of its confidential documents and placed these documents in various locations. While it is true that, at the time of the state court's preliminary injunction hearings, Ms. Attariwala had already created the "Jessie docs" folder and placed it in no fewer than three locations (one of which is *still* unknown), it would be months before Singota was more fully aware of the wrongdoings committed by Ms. Attariwala. Moreover, Singota only learned of these improprieties through its own investigations, *not* from Ms. Attariwala's candor,

---

harm when it waited seven months between the initial request for a preliminary injunction and the expanded request now in dispute. If Singota was truly facing irreparable harm from Ms. Attariwala's alleged failure to comply, it would have sought a more restrictive remedy sooner. Singota replies: Ms. Attariwala's first point ignores the fact that it has vigorously asserted its rights for the past seven months. Singota first sought assistance to remedy Ms. Attariwala's alleged noncompliance with the state court's preliminary injunction when it filed its show cause motion on April 16, 2019. Ms. Attariwala was found in contempt on April 18, 2019, as memorialized in a written order entered on May 6, 2019. This order went unchallenged by Ms. Attariwala until she moved to vacate it on June 24, 2019. Magistrate Judge Baker promptly denied the request without prejudice on June 26, 2019, finding that the request should first be directed to the state court. Ms. Attariwala filed her renewed motion to vacate on July 12, 2019, which Singota timely opposed. On August 30, 2019, Judge Baker ordered additional briefing on the motion. Both parties complied and submitted their briefs on September 13, 2019. Singota next filed its motion for preliminary injunction on October 10, 2019, after learning about Ms. Attariwala's "Jessie docs" folder. Judge Baker ultimately granted Ms. Attariwala's motion on October 23, 2019. In sum, Singota zealously sought to protect its trade secrets and thus its current request is not "fatally undermined" by its dilatoriness in contesting Ms. Attariwala's failure to comply. Even if Singota had not been actively litigating Ms. Attariwala's noncompliance, delay alone of this sort does not warrant a denial of a preliminary injunction without reaching the merits, absent some prejudice to Ms. Attariwala. *See Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) (noting that "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered" but concluding that an eight-month delay was not "inexcusable" absent an argument from Defendant that he was prejudiced by delay). Ms. Attariwala has never maintained that she has been prejudiced by Singota's delay.

transparency, or voluntary disclosures. Ms. Attariwala's half-hearted response to assertion by Singota is that Singota knew that it was entering into a universe of unknowns when it agreed to the state court's injunction and should have anticipated that there would be such revelations.

We do not believe it is reasonable to have expected Singota to have foreseen at the beginning of this litigation that Ms. Attariwala would lead Singota on a months-long wild goose chase in search of its stolen trade secrets, or that Ms. Attariwala would consistently manifest a lack of forthrightness in disclosing what documents she had taken and where and with whom she had shared them. Singota asserts that it believed in March 2019 that the stipulated preliminary injunction would prompt the disclosure of all of Ms. Attariwala's accounts and devices, and that these matters could be fully investigated and resolved. Forensic analysis has established that this has not occurred; far from it. It has taken months of forensic expert analysis (and, to date, $170,000 in expert fees) to uncover the extent of Ms. Attariwala's theft. This was information she alone was in the position to identify and return at the outset of this dispute, but chose to conceal until the nature and extent of her misappropriations and diversions were eventually discovered.

We cannot agree with Ms. Attariwala's assertion that the known risk of misappropriation, and the consequent risk of irreparable harm, is no greater today than it was in March 2019. Ms. Attariwala's candor and transparency could have mitigated this harm, had she chosen to cooperate. Her own recalcitrance has contributed to Singota's irreparable harm.

That said, we should note that Ms. Attariwala rejects to some extent Singota's accusations regarding her noncompliance, broadly stating that "she has complied where she can," that any outstanding devices or accounts belong to her husband,[15] and that the outstanding accounts and devices are beyond her reach or knowledge. She sidesteps the most serious of Singota's accusations and investigatory findings by refusing to answer such questions as: Where did she copy the "Jessie docs" folder on February 27, 2019? To what OneDrive account did she access just moments later? What files has she deleted? Has Singota discovered the full extent of everything she expropriated?

Ms. Attariwala's frequent answer to many of Singota's legitimate questions is that "she does not remember." Such a cavalier dismissal is inadequate. Her feigned naivety also suggests that she does not yet appreciate the seriousness of her situation. As Ms. Attariwala was previously advised by the state court judge during the contempt hearing:

> I understand you might not remember them all but once you're sued, once you're sued for what amounts to theft, then you have to start thinking okay where have I put each and every bit of this information and if she thought she was going to hide some of it and not report it[.]

[Dkt. 85, Exh. J]. Defense counsel's argument that Ms. Attariwala no longer has access to the stolen documents is also unpersuasive. If true, one wonders why Ms. Attariwala refuses to declare as much under oath. Without Ms. Attariwala's forthright sworn representations and assurances, Singota's efforts to verify the full scope of the harm with which it must contend.

---

[15] Simranjit Johnny Singh, aka Simranjit J. Attariwala, aka Sim J. Singh, was named as a defendant in the Amended Complaint. He has moved to dismiss the claims against him for lack of personal jurisdiction. No ruling has been entered to date on that motion.

Our court recently rejected in a similar situation a defendant's belated assertions, unsupported by the evidence or his own testimony, that he had relinquished all misappropriated documents. *Badger*, 2019 WL 4572798, at *10 (S.D. Ind. Sept. 20, 2019). We reach the same conclusion here. Ms. Attariwala's refusal to disclose, or even admit what she has taken even after it was discovered, coupled with her persistent pattern of withholding accounts and devices, leaves us highly skeptical that without the preliminary injunction Singota's interests cannot be protected. On the record before us, we cannot definitively conclude that Ms. Attariwala no longer possesses or has access to Singota's trade secrets and, if these trade secrets were utilized or distributed by Ms. Attariwala, Singota would, indeed, likely face irreparable harm.

Singota thus has satisfied the first three preconditions for a preliminary injunction. We address finally whether any irreparable harm would flow to Ms. Attariwala should an injunction enter, balancing the parties' respective harms against each other. Until the evidence establishes that Ms. Attariwala no longer possesses or has access to Singota's trade secrets, in any form, the harm Singota faces due to the actual or threatened misappropriation of these materials greatly outweighs any harm Ms. Attariwala may suffer.

As in *Badger* and *Toyota*, any potential harm Ms. Attariwala may experience through entry of an injunction is reparable in that she possesses "the keys to [her] release." *Badger*, 2019 WL 4572798, at *10 (S.D. Ind. Sept. 20, 2019); *Toyota*, 2013 WL 3670133, at *7. If and when Ms. Attariwala fulfills her disclosure and production obligations by providing adequate evidentiary assurances that she no longer possesses,

nor can gain access to, Singota's trade secret information, the employment restrictions imposed by this injunction will be lifted. Further, we find no risk that the public will be harmed by the entry of this injunction because, simply stated, Ms. Attariwala does not have a right to use, possess, or disclose Singota's trade secrets. *Badger*, 2019 WL 4572798, at *12; *Toyota*, 2013 WL 3670133, at *8.

We share the concern expressed by the state court judge that Ms. Attariwala's "lack of candid nature" means "she doesn't take this seriously yet." [Dkt. 85, Exh. J.] Ms. Attariwala's failure to accept responsibility for her wrongful appropriation of data and other proprietary matter belonging to Singota so far has not resulted in any punitive or coercive consequences. Her reticence, or more aptly, her refusal, has required Singota (and the Court) to expend substantial resources to resolve the problems she admits to having caused.

The existing state court issued preliminary injunction has not generated Ms. Attariwala's cooperation or compliance. A revised preliminary injunction is thus necessary. The specific terms of the preliminary injunction shall be set forth in a separate order and remain in effect until further order of the Court.

IT IS SO ORDERED.

Date:   12/18/2019            _____
                              SARAH EVANS BARKER, JUDGE
                              United States District Court
                              Southern District of Indiana

Distribution:

Justin A Allen
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
justin.allen@ogletree.com

Cynthia A. Bedrick
MCNEELY STEPHENSON (Shelbyville)
cabedrick@msth.com

Jody M. Butts
MCNEELY STEPHENSON THOPY & HARROLD
jmbutts@msth.com

Jason Donald Clark
MCNEELY STEPHENSON (Shelbyville)
jason.d.clark@msth.com

Susan H. Jackson
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
susan.jackson@ogletree.com

Paul L. Jefferson
MCNEELY STEPHENSON
Paul.L.Jefferson@msth.com

Erik Christopher Johnson
MCNEELY STEPHENSON (Indianapolis)
erik.c.johnson@msth.com

Christopher C. Murray
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
christopher.murray@ogletreedeakins.com