**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| BIOCONVERGENCE, LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     vs. | )   Civil Action No. 1:19-cv-01745-SEB-TAB |
| | ) |
| JASPREET ATTARIWALA and | ) |
| SIMRANJIT JOHNNY SINGH a/k/a | ) |
| SIMRANJIT J. ATTARIWALA a/k/a | ) |
| SIM J. SINGH, | ) |
| | ) |
|     Defendants. | ) |

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS MOTION TO RECONSIDER
MARCH 4, 2020 ORDER MODIFYING PRELIMINARY INJUNCTION**

BioConvergence LLC d/b/a Singota Solutions ("Singota") respectfully moves the Court to reconsider its March 4, 2020 Order Modifying Preliminary Injunction ("Modifying Order") [Dkt. 156]. There has been no change in circumstances since the Court entered its December 18, 2019 Preliminary Injunction that warrants modifying the injunction. *See* Preliminary Injunction ("PI") 9 [Dkt. 122]. To the contrary, Singota continues to face the same risk of irreparable harm that led this Court to issue its Order Granting Plaintiff's Motion for Further Preliminary Injunction ("PI Order") on December 18, 2019. [Dkt. 121.] In that order, this Court found:

> Ms. Attariwala's refusal to disclose, or even admit what she has taken even after it was discovered, coupled with her persistent pattern of withholding accounts and devices, leaves us highly skeptical that without the preliminary injunction Singota's interests cannot be protected. On the record before us, we cannot definitively conclude that Ms. Attariwala no longer possesses or has access to Singota's trade secrets and, if these trade secrets were utilized or distributed by Ms. Attariwala, Singota would, indeed, likely face irreparable harm.

Dkt. 121 at 31. The Court's findings were based on an extensive evidentiary record that included substantial computer forensic evidence as well as evidence regarding Attariwala's prior

misrepresentations (including misrepresentations under oath) and course of obstructive conduct over the course of this litigation.  The Court's PI thus enjoined Attariwala from:

> being employed in any capacity by or with Emergent or any other competitor of Singota ***until she provides evidence in a proper verifiable form***: that she has surrendered to Singota all the Singota documents she wrongfully took as well as all accounts and devices to which she copied, transmitted, disclosed, or shared Singota's documents; that she no longer has access to or possession of Singota's confidential information and trade secrets in any form; and that no third party to whom she may have distributed these documents, or the confidential information therein, continues to retain them in derogation of her requests that they be returned to Singota.

Dkt. 122 at 3-4 (emphasis added). As set forth below, Attariwala has ***not*** provided any new, persuasive, reliable evidence that she has satisfied these conditions for lifting the order barring her from working for Emergent or other competitors. Rather, she has simply repeated her prior unreliable denials in a new declaration that fails to address key outstanding issues.

On February 4, 2020, this Court ordered Attariwala "to complete the assigned duties per Paragraph III of our Preliminary Injunction no later than ten days following the entry of this Order." Order, Dkt. 142 at 5-6. On February 12, 2020, Attariwala filed "Defendant Jaspreet Attariwala's Response to Preliminary Injunction" ("Def.'s Resp."). [Dkt. 148.][1] Singota interpreted Attariwala's "Response" to be her attempt to respond to the Court's February 4 Order giving her ten days to complete certain duties under the PI. Attariwala's Response consists of four pages appearing to provide responses to various aspects of the preliminary injunction. In addition, on the third page of Attariwala's Response, there is a statement in the middle of the page that "Defendant respectfully requests this Court to release her from the prohibition of employment in

---

[1] Attariwala's "Response" did not contain Attariwala's original signature but rather a typed signature.  It appears that under Local Rule 5-10(g), the Court should have given notice to Attariwala of her failure to comply with that rule's and Federal Rule of Civil Procedure 11's signature requirement and a reasonable time to correct it.

the biotech industry, as she needs to make a living and her background and experience are in the biotech industry." [Dkt. 148 at 3.][2] Attariwala's Response also concludes with a section under the heading "Request for Modification." [Dkt. 148 at 3.] In that section of her Response, Attariwala states that she "requests that this Court modify its injunction to show Defendant a clear path forward so that she may satisfy the Court and be relieved of the provisions of the injunction." [Dkt. 148 at 4.] Attached as Exhibit A to Attariwala's Response is the 45-paragraph Affidavit of Jaspreet Attariwala purporting to comply with various aspects of the PI ("Attariwala Decl.").[3]

On March 4, 2020, this Court issued an Order Modifying Preliminary Injunction ("Modifying Order.") Dkt. 156. In the Modifying Order, the Court stated that it construed Attariwala's Response as a motion to modify the preliminary injunction. *Id.* at 3 n.3. The Court noted that Singota had not filed a response or objection to Attariwala's Response construed as a motion and therefore assumed that Singota "has no quarrel with the accuracy of Ms. Attariwala's representations and that her assurances are satisfactory at this time." *Id.* The Court thus modified the PI to "lift our prohibitions against the resumption of Ms. Attariwala's employment in the biotechnology industry generally." *Id.* at 5. The Court also vacated paragraph IV of the PI, which

---

[2] Significantly, Singota did not request that this Court prohibit Attariwala from working in the "biotech industry," nor did the Court order that she not work in the "biotech industry." Rather, Singota asked the Court to order "Attariwala not to work for Emergent **or any other competitor in the CDMO/CMO industry** during the pendency of this litigation." Pl.'s Reply Supp. Mot. Further Preliminary Injunction ("Reply"). Dkt. 95 at 12. *See also* Official Reporter's Transcript of Motion for Preliminary Injunction hearing on December 4, 2019 ("Dec. 4 2019 Tr.") at 45:4-8, attached hereto as **Exhibit A.** ("THE COURT: So summarize your proposal, that you want an injunction that restrains her from working for her current employer? MR. MURRAY: For her current employer or in the CDMO industry."). And this Court's PI enjoined Attariwala "from being employed in any capacity by or with Emergent or any other competitor of Singota." Dkt. 122 at 3. Singota does not understand the Court's PI order to bar Attariwala from working in the entire "biotech" industry.

[3] Attariwala's affidavit is not notarized but does state that it is made under penalties of perjury. It would appear to substantially satisfy the requirements for an unsworn declaration under 28 U.S.C. § 1749.

had specifically ordered that Attariwala was enjoined from being employed in any capacity by or with Emergent or any other competitor of Singota. *Id.*

Singota respectfully moves for reconsideration of the Court's Modifying Order, which was based on the Court's incorrect assumption that Singota "has no quarrel with the accuracy of Ms. Attariwala's representations and that her assurances are satisfactory at this time." *Id.* As set forth below, Singota does have a quarrel with Attariwala's representations, which are inaccurate, and her alleged assurances in her Response are no more convincing now than those she previously provided but which repeatedly turned out to be false and inconsistent with the findings of the computer forensic expert and other evidence.

Among other deficiencies, Attariwala's Response and Declaration:

- fail to provide any additional information regarding the copy of the "Jessie Docs" folder containing thousands of pages of stolen Singota data that she made on February 27, 2019, the day this lawsuit was filed;

- fail to provide any additional credible information regarding this missing WD MyBook drive that Green discovered was connected to Attariwala's personal Surface computer in November 2018, about which Attariwala has given conflicting accounts (including claims under oath in a prior declaration that it had been destroyed in late 2017); and

- fail to address the numerous outstanding accounts that Attariwala has failed to produce to Rebecca Green.

Singota's overriding concern is that Attariwala has retained a copy or access to a copy of the substantial amount of Singota data she misappropriated. This can be very easily done by saving a copy of that data to a single device or in a single account that is never produced, including any device or account that Attariwala has access to indirectly (such as by claiming it belongs to her

4

husband and is outside her possession, custody, and control). Singota's concern is not merely hypothetical. ***The facts show that there is still at least one copy of the Singota data that Attariwala indisputably made that remains unaccounted for***, even after she has submitted her Response and Declaration. The PI should remain in place in full.

## I.       THIS COURT SHOULD RECONSIDER ITS MODIFYING ORDER[4]

The Court should grant this motion for reconsideration to allow Singota to respond and object to Attariwala's Response on the merits to the extent the Court has construed her Response as a motion to amend the PI. Singota was unaware until it received the Court's Modifying Order on March 4, 2020, that the Court was treating Attariwala's Response as a motion subject to Local Rule 7-1. *See* Dkt. 156 at 4 (noting that under Local Rule 7-1(c)(5), a court may summarily grant an unopposed motion).

### A.      Singota was unaware the Court intended to construe Attariwala's Response as a motion.

Although Singota understands that this Court has authority to construe *pro se* filings liberally, Singota reasonably did not anticipate the Court would treat Attariwala's Response as a motion prior to receiving the Court's Modifying Order. Attariwala's filing was titled "Response to Preliminary Injunction." [Dkt. 148.] Singota interpreted the Response as Attariwala's attempt to fulfill the requirements of the Court's February 4 Order giving her ten days to perform certain duties under the PI. The majority of Attariwala's Response was directed to responding to findings by the Court in its PI.  *Id.* at 1-3. In large part, Attariwala simply repeated denials in her Response that she had already made previously in this litigation (and which have repeatedly proven

---

[4] Given the extensive treatment this case has received from the Court over the past several months, Singota respectfully refers the Court to the PI Order for the factual and procedural background rather than re-stating it here. *See* PI Order [Dkt. 121] at 2-19.

unreliable). *Id*. For example, on the first page of her Response, Attariwala declared that she "is not possessing, transmitting, using, copying, or disclosing to others Singota's confidential information or trade secrets . . . ." Dkt. 148 at 1. But this denial and the others included in Attariwala's Response did not differ in substance from Attariwala's prior denials in other declarations and briefs that were later refuted or called into question by computer forensic analysis and other evidence. Attariwala's Response did not provide any new evidence or information to support her denials or rehabilitate her damaged credibility.

In addition to several pages repeating the same denials she had already made, Attariwala stated buried in the middle of her Response that she wanted the Court to "release her from the prohibition of employment in the biotech industry[.]"  *Id.* at 3.  But as noted above, Singota did not request, nor did it understand the PI to order, that Attariwala be prohibited from working in the "biotech industry." Rather, Singota's request in seeking injunctive relief was more focused: that Attariwala be enjoined from working for Emergent or other competitors within the *CMO/CDMO industry* where she could most easily make use of the mountains of competitive data she had misappropriated from Singota.[5] *See, e.g.*, Pl.'s Reply Supp. Mot. Further Preliminary Injunction ("Reply") [Dkt. 95] at 12. Singota understood the PI order to be consistent with its request; that is, as *not* barring Attariwala from working in the "biotech industry" as a whole.

In addition, Attariwala asserted in her Response that she "earnestly wishes to respect and abide by this Court's Orders in every way possible" and asked the Court "to show Defendant a clear path forward so that she may satisfy the Court and be relieved of the provisions of the injunction." *Id.* at 4. Although these statements appeared under the heading "Request for

---

[5] The only CDMOs that Attariwala has ever worked for are Singota and Emergent. Attariwala's other prior work experience is outside that industry.

Modification," Singota understood these statements to be rhetorical because no statements in that section actually *requested any modification to the PI. See id.* at 4-5.

Upon reviewing Attariwala's Response, Singota anticipated that Attariwala might be planning to file a motion seeking reconsideration of the Court's entry of the PI in the future. But Singota reasonably did not construe the Response as being such a motion for several reasons. First, as noted above, Singota assumed that Attariwala's Response was her attempt to show that she had met the deadline for compliance with the PI set by this Court's February 4, 2020, order. [Dkt. 142 at 5-6.][6]

Second, Singota reasonably did not construe Attariwala's Response as a motion because her filing did not meet the requirements of Local Rule 7-1(a), which mandates that all motions be separate and that "[a] motion must not be contained within a brief, response, or reply to a previously filed motion." S.D. Local Rule 7-1(a). Here, even if Attariwala's "Request for Modification" were viewed as a motion, it was included within a "Response" and not labeled or filed as a motion. This Court has observed that "[i]t is well-established that 'pursuant to Local Rule 7-1(a), the Court will not consider a motion that is contained within a response brief.'" *Rooks v. United States*, No. 115CV00079SEBDML, 2016 WL 368024, at *1 (S.D. Ind. Jan. 28, 2016). This Court has applied this rule to *pro se* parties. *See id. See generally Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006) ("[T]he Supreme Court has made clear that even pro se litigants must follow rules of civil procedure.") (citing *McNeil v. United States*, 508 U.S. 106 (1980).)  Moreover, Attariwala has already been admonished in this litigation to follow Local Rule 7-1(a). *See* Order on Defendant's Motion to Stay Proceedings [Dkt. 100] at 1-2 (denying Attariwala's motion to stay

---

[6] As set forth below, Attariwala's Response falls far short of complying with the PI.  Singota anticipated addressing her compliance failures in a motion of its own.

proceeding because it was embedded in a response brief and failed to comply with Local Rule 7-1(a)). Thus, even if Attariwala's requests for relief in her Response could constitute a motion, that motion was improperly included in the body of a response in violation of the Local Rules.

Third, Singota also reasonably did not construe Attariwala's Response as a motion for purposes of Local Rule 7-1 because the Court's docket reflects that her filing was not docketed as a motion. *See* Docket entry 148 as of March 5, 2020 (not docketing Attariwala's Response as a "MOTION" but rather as a "RESPONSE").[7] The clerk's docketing Attariwala's filing as a "Response" was consistent with Singota's understanding that the filing was intended to try to respond to the Court's February 4 Order setting a deadline for Attariwala to comply with the PI.

For all of these reasons, Singota's not viewing Attariwala's Response as a motion requiring its own response under Local Rule 7-1(c) was reasonable.

### B.   Reconsideration is appropriate to allow Singota to state its objections on the merits to Attariwala's Response to the extent it is construed as a motion to modify the preliminary injunction.

A "district court has the inherent power to reconsider interlocutory orders and reopen any part of a case before entry of final judgment." *Fisher v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 145, 149 (S.D. Ind. 1993); *see also* Fed. R. Civ. Pro. 54(b). Indeed, "[n]ot only is a motion to reconsider an allowable method of reviewing a prior order, it is the most appropriate and advantageous method of seeking relief from an interlocutory order for a party to pursue." 152 F.R.D. at 149. "A motion to reconsider may be granted as justice requires." *Frazee v. Dearborn Cty. Sheriff's Dep't*, No. 416CV00005SEBDML, 2018 WL 4680156, at *1 (S.D. Ind. Sept. 28, 2018).

---

[7] Singota also did not view her "Response" as triggering the reply deadline under Local Rule 7-1(c)(3)(B) because there was no underlying motion to which Attariwala was responding. Local Rule 7-1(c)(3)(B) (replies due 7 days after service of responses).

Justice requires reconsideration of the Modifying Order. The Court issued that order based on Singota's not responding or objecting to Attariwala's "Response" as though it were a motion under Local Rule 7-1. *See* Modifying Order at 3 n.3. But as set forth above, Singota reasonably did not file a response or objection under Local Rule 7-1 because it was unaware that the Court intended to construe Attariwala's Response as a motion until it received the Court's Modifying Order on March 4, 2020. By that point, the deadline for filing a response under Local Rule 7-1 had passed.[8] Because Singota did not have prior notice that Attariwala's Response was intended to be treated as a motion, it would be unfair and inequitable to deny Singota the opportunity to oppose that Response on the merits in a motion for reconsideration after receiving such notice. In other words, it would be inequitable to excuse Attariwala's failure to comply with L.R. 7-1(a) and simultaneously treat Singota's non-response to Attariwala's defective "motion" as a waiver of its objections under Local Rule 7-1(c)(5). The injustice of such an approach would be especially severe here, where, as shown below, Attariwala's Response is inaccurate, her request to modify the injunction is without merit, and the preliminary injunction should remain in full force to protect Singota from irreparable harm for all of the same reasons that led the Court to issue the injunction in the first place in December 2019.

Even if the Court were to conclude that Singota should have out of abundance of caution interpreted Attariwala's Response as a motion and filed an objection under Local Rule 7-1, reconsideration of the Modifying Order would still be appropriate and just. Reconsideration would

---

[8] If Attariwala's "Response" is treated as a motion, Singota's response would have been due within 14 days after service of the Response with three extra days for service by email. Federal Rule of Civil Procedure 6(d); Local Rule 7-1(c)(3)(A).  The certificate of service attached to her Response does not include a date of service although it states it would be served by mail. *See* Doc. 148 at 5. The Response was filed by this Court on February 12, 2020. Under Federal Rule of Civil Procedure 6(d) and Local Rule 7-1(c)(3)(A), Singota's response to Attariwala's Response would likely have been due on February 28, 2020 (if the Response was served on February 11) or March 2, 2020 (if the Response was served on February 12).

allow Singota the opportunity to respond to Attariwala's misrepresentations in her Response on the merits and to oppose any modification of the PI based on the evidence. Reconsideration would thus allow this Court to address the merits of this matter rather than rule on procedural grounds to modify a fundamentally important order in this case. As another court in this District has observed:

> Where a previous error [of counsel in missing a deadline under the local rules] is the result of negligence or other nonculpable conduct, and when a motion involves important issues which may effect the outcome of case . . . , the dispute is better decided on the merits than on procedural grounds. In these circumstances, the court is generally inclined to grant a motion to reconsider when a party interposes valid arguments in support of the motion.

*Fisher v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 145, 149 (S.D. Ind. 1993).

Here, for all of the reasons set forth above, Singota has not be negligent in missing any filing deadlines because it was not apparent that Local Rule 7-1 applied to Attariwala's Response. But even assuming solely for the sake of argument that there was no doubt Local Rule 7-1 applied and that Attariwala's Response would be construed as a motion, reconsideration would be appropriate to allow Singota to state its objections to her "motion" on the merits under a theory of excusable neglect. *See* Fed. R. Civ. P. 6(b)(1)(B) (permitting extension of filing deadlines after deadlines have passed for "excusable neglect"); *Nichols v. Aspire Indiana, Inc.*, No. 117CV01678SEBMJD, 2017 WL 6406835, at *1 (S.D. Ind. Dec. 15, 2017) (holding that plaintiff's late-filed response to motion "was filed in good faith" and "was not intentionally filed in violation of the deadline to respond to the motion to dismiss" and granting leave to file late response on basis of excusable neglect). The Supreme Court has instructed that the determination of excusable neglect

> is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission. These include . . . the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993). Applying these equitable considerations here weighs in favor of reconsideration (although Singota respectfully denies that it failed to comply with any obviously applicable filing deadline). There would be no danger of prejudice to Attariwala because, as set forth below, on the merits the preliminary injunction should remain in place unmodified to protect Singota from irreparable harm. In addition, Singota has moved swiftly to prepare this motion after first learning on March 4 that the Court construed Attariwala's Response as a motion. Singota has researched, drafted, and filed this motion for reconsideration promptly after receiving the Modifying Order. Finally, Singota has acted in good faith, filing this motion as soon as it learned that the Court deemed Attariwala's response to be a motion to avoid delay.

It is also significant, as set forth below, that Attariwala's Response fails to address the longstanding, well-documented issues that led to entry of the PI by presenting any *new* evidence or arguments. In addition, the relief purportedly requested by Attariwala is inconsistent with the terms of the PI and is perhaps even unnecessary given her stated intention to refrain from working at a competitor of Singota.  The Court never ordered (and Singota never requested) that Attariwala be enjoined from working in the "biotech industry" generally, as Attariwala now suggests.  Rather, Section IV of the Preliminary Injunction bars Attariwala "from being employed in any capacity by or with Emergent or any other competitor of Emergent[.]"  [Dkt. 156 at p. 3.] Singota's competitors are in the CMO/CDMO industry. Attariwala herself represents that "[s]he is not seeking, nor would accept, employment with any other competitor of Singota."  [Dkt. 148 at p. 3.]  If Attariwala's representation is true, there would be no need for the Court to lift the restrictions imposed under Section IV of the Preliminary Injunction.

11

The Court should grant this motion for reconsideration to allow Singota the opportunity to respond to Attariwala's Response on the merits and to oppose any modification of the PI to allow Attariwala to work for Emergent or any other Singota competitor in the CMO/CDMO industry during the pendency of this case.  As shown below, the Court should reconsider its Modifying Order, vacate that order, and reinstate the PI in full.

## II.      ATTARIWALA'S REQUEST TO MODIFY THE PRELIMINARY INJUNCTION SHOULD BE DENIED.

This Court issued an expanded preliminary injunction on December 18, 2019, finding there was no dispute that Attariwala "departed from Singota with an extraordinary amount of its confidential documents in tow, many of which matters were of economic value to Singota and the subject of reasonable efforts to maintain their secrecy." Dkt. 121 at 20. The Court thus found that Singota is reasonably likely to succeed on the merits of its claims against Attariwala under the Indiana Uniform Trade Secrets Act. *Id.* at 20-23. The Court further found that it is well established that "[a]n employee who illicitly takes and retains [her] employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of [its] legal claim[]." *Id.* at 25. The Court also determined that Singota faces a risk of irreparable harm from Attariwala misconduct. As this Court summarized in its PI order:

> Because Ms. Attariwala has not been forthright in disclosing the documents she apprehended nor where or with whom she has shared them, and that she has wantonly violated the state court's injunctive order, Singota seeks greater protection to ensure that its confidential information is not improperly disclosed or used to its economic detriment.

Dkt. 121 at 18.

Attariwala's new Response and Declaration fail to provide any basis for modifying the PI, which remains necessary to protect Singota from irreparable harm. The undisputed evidence continues to show that Attariwala, after seeking and obtaining a job offer from Singota's competitor Emergent, used the final weeks of her employment with Singota to harvest Singota's trade secret, confidential, and propriety information with the intent of using that information to compete against Singota at Emergent. It remains established that Attariwala:

- used Singota data while she was still employed by Singota in December 2019 to create a cloud-based Googledoc that she titled, "Leads – Emergent," which contained confidential information regarding numerous Singota prospects and clients, Doc. 85 at 9-10;

- within minutes of accepting her job offer from Emergent at 8:44 PM on December 11, 2019, ran six reports from Singota's client relationship management ("CRM") database listing information regarding Singota's clients and prospects, including information pertaining to at least 279 organizations and 1,556 individuals, Doc. 85 at 7-8;

- made .pst files on December 19, 2019, of her Singota email account's inbox and sent folder, which contained at least 10,733 Singota emails, of which 4,872 included attachments, many of which contain trade secret, confidential, and proprietary information belonging to Singota and its clients and prospects, Doc. 85 at 8-9;

- copied over 250 other Singota documents containing the Company's trade secret, confidential, and proprietary information, many specifically relating to clients and prospective clients, Doc. 85 at 9;

- placed this misappropriated data in a new folder that she created on her Singota Microsoft Surface tablet ("Singota Surface") and named "Jessie Docs," in which she

carefully organized the misappropriated information into subfolders with titles such as "Company Names" and "Leads," Doc. 85 at 8;

- copied this massive amount of misappropriated data multiple times, including placing it on her personal external Seagate hard drive and on her personal Microsoft Surface tablet ("Attariwala Surface"), Doc. 85 at 9; and

- began reaching out to Singota's clients and prospects to alert them that she would be moving to Emergent where she informed them she would continue to work in the "CMO space" and would reach out to them once she started her new job, Doc. 85 at 10-11.

After many months of litigation, on October 10, 2019, Singota filed its Motion for Further Preliminary Injunction seeking a preliminary injunction order barring Attariwala from working "for Emergent or any other competitor in the CDMO/CMO industry during the pendency of this litigation." [Dkt. 85 at 35.] At the core of Singota's motion was its assertion that the computer forensic expert, Rebecca Green, continued to discover additional devices and accounts not disclosed by Attariwala months after she had been ordered to identify and produce them. Singota asserted:

> Green's recent analysis has determined there is a significant risk that Attariwala continues to possess one or more copies of the Singota ESI she misappropriated. To protect Singota's trade secrets and other confidential ESI, this Court should enter an additional preliminary injunction ordering Attariwala not to work for Emergent or any other competitor where she could use Singota's ESI.

*Id.* at 3. In particular, Green had recently discovered through her continued investigation that Attariwala:

- On February 27, 2019, the day this lawsuit was filed, made a copy of the Singota data she had misappropriated to a device or account that she had still not disclosed, Doc. 85 at 15 & 27;

- Had connected a number of devices, including a Western Digital hard drive, to computers containing Singota's ESI that she had never disclosed or produced; Doc. 85 at 27; and

- Appeared to possess or have access to numerous additional cloud accounts that she had never disclosed or produced.

In addition, in support of its motion for further injunctive relief, Singota argued that the evidence and record showed Attariwala had never taken responsibility for her actions but instead engaged in a persistent pattern of obfuscation and obstruction. At no point had she ever demonstrated candor regarding her misconduct or a willingness to help mitigate and remediate the harm she had caused. Initially, in response to Singota's initial cease-and-desist letter and demand for assurances, Attariwala denied engaging in any misconduct. [Dkt. 121 at 5.] Later, when confronted during her deposition on July 11, 2019, with multiple examples of trade-secret, confidential, and proprietary information she had misappropriated from Singota, Attariwala implausibly claimed she had taken it solely to stay in contact with "friends," an explanation this Court later referred to as "unbelievable" and "silly." Dec. 4 2019 Tr. at 54:16-20.

More recently, in opposing Singota's motion for further injunctive relief, Attariwala changed her story yet again and began to claim that she had misappropriated Singota's information, not to use at Emergent but rather only to support an alleged claim for bonuses or commissions. [Dkt. 121 at 17.] But by presenting this new story (which is also easily refutable with the evidence, such as that showing Attariwala used Singota's information to create a Googledoc titled "Leads – Emergent"), Attariwala still fails to acknowledge the simple and obvious truth that she took

15

information from Singota that she anticipated would be useful to her in her new position at Emergent where she would be marketing Emergent's competing services within the same CMO/CDMO industry that she had serviced while employed at Singota.

During the preliminary injunction hearing on December 4, 2019, and in the PI Order, this Court recognized Attariwala's persistent lack of credibility throughout this litigation. For example:

> THE COURT: Let me cut through what you're doing. So you have many examples of her disingenuousness, perhaps her lying, her obstruction, her lack of candor, and the fact that she's continued to make your search for documents difficult, if not impossible, and unreliable; is that true?
>
> MR. MURRAY: Yes.
>
> THE COURT: Now go through your next set of documents.

Dec. 4, 2019 Tr. at 36:9-15. During Attariwala's counsel's argument, the Court observed:

> THE COURT: [Y]ou can take it as a rhetorical question. When she says that she took information because it had the e-mail of a friend, that is unbelievable, isn't it? Now you don't have to answer that. You should not answer that, but I'm just saying that that is a silly answer.
>
> MR. JEFFERSON: I am not --
>
> THE COURT: And that answer, when it's given under oath in a deposition is so patently inaccurate, so silly, I would say, that the plaintiff is on solid ground not to rely on that because that is not why she took it. She took it because she was trying to prepare herself for her next employment so she would be as successful there as she had been previously, and that she would have a running start on the kind of client contacts that she wanted to make because she made contacts with potential friends that she says "I'll be back with you after I get my feet under me."

Dec. 4, 2019 Tr. at 54:14- 55:6. The Court further observed:

> THE COURT: . . . And one of the difficulties here that's become evident in Mr. Murray's presentation specifically, but you've not allayed my fears, Mr. Jefferson, and that is that in terms of sworn statements and representations by Ms. Attariwala, that they're not reliable enough that we can enter into a stipulated order that requires her to do certain things and make certain promises and then live with them.

Dec. 4, 2019 Tr. at 58:25-59:7. And the Court further noted:

> THE COURT: Don't you see that since that time, the situation has materially changed because the plaintiff keeps finding ways in which it's [been] misled by Ms. Attariwala's statements and disclosures? I mean, their position has changed because they couldn't rely on Miss Attariwala's good faith compliance with the agreement that was entered in March.

Dec. 4, 2019 Tr. at 61:12-17.

And in granting the PI, the Court noted that Attariwala's lack of candor contributed to the need for further injunctive relief. *See* Dkt. 121 at 29-32 (noting that Attariwala's "lack of forthrightness in disclosing what documents she had taken and where and with whom she had shared them," that Attariwala "chose to conceal [data and documents] until the nature and extent of her misappropriations and diversions were eventually discovered," that "Ms. Attariwala's candor and transparency could have mitigated this harm" but her "own recalcitrance has contributed to Singota's irreparable harm," that Attariwala's "cavalier dismissal [of Singota's concerns] is inadequate," that "[h]er feigned naivety also suggests that she does not yet appreciate the seriousness of her situation," that Attariwala's "lack of candid nature" means "she doesn't take this seriously yet," and that Attariwala had failed "to accept responsibility for her wrongful appropriation of data and other proprietary matter belonging to Singota"). Ultimately, the Court held:

> Defense counsel's argument that Ms. Attariwala no longer has access to the stolen documents is also unpersuasive. If true, one wonders why Ms. Attariwala refuses to declare as much under oath. Without Ms. Attariwala's ***forthright*** sworn representations and assurances, Singota's efforts to verify the full scope of the harm with which it must contend.

Dkt. 121 at 30 (emphasis added). The Court thus ordered:

> Ms. Attariwala's refusal to disclose, or even admit what she has taken even after it was discovered, coupled with her persistent pattern of withholding accounts and devices, leaves us highly skeptical that without the preliminary injunction Singota's interests cannot be protected. On the record before us, we cannot definitively conclude that Ms. Attariwala no longer possesses or has access to Singota's trade secrets and, if these trade secrets were utilized or distributed by Ms. Attariwala, Singota would, indeed, likely face irreparable harm…. ***Until the evidence***

> ***establishes that Ms. Attariwala no longer possesses or has access to Singota's trade secrets, in any form***, the harm Singota faces due to the actual or threatened misappropriation of these materials greatly outweighs any harm Ms. Attariwala may suffer. . . . If and when Ms. Attariwala fulfills her disclosure and production obligations ***by providing adequate evidentiary assurances that she no longer possesses, nor can gain access to, Singota's trade secret information, the employment restrictions imposed by this injunction will be lifted***.

*Id.* at 31 (emphasis added). Based on the Court's findings in the PI Order, the Court issued a preliminary injunction that imposed a variety of restrictions on her designed to protect Singota from irreparable harm. [Dkt. 122.]

Attariwala's Response and Declaration submitted on February 12, 2020, are not "forthright" and do not provide "adequate evidentiary assurances" establishing that Attariwala no longer possesses or has access to Singota's trade secrets in any form. As a general matter, Attariwala's Response and Declaration fail to rehabilitate Attariwala's credibility; they do the opposite by continuing to demonstrate Attariwala's lack of candor and forthrightness. Attariwala's Response and Declaration fail to allay the Court's and Singota's reasonable concerns that she continues to possess or have access to one or more copies of the data she misappropriated from Singota.  Specifically, Attariwala:

- Admits that she made the February 27, 2019, copy of the Singota data she misappropriated ***but still fails to provide any information regarding where that copy is now***, *see* Attariwala Decl. [Dkt. 148] ¶¶ 22-23;

- Fails to provide any additional information regarding the missing WB MyBook drive that was connected to her computer but which she now claims no longer exists, *id.* ¶¶ 31-31; and

- Fails to provide any reasonable assurances regarding the numerous missing accounts that Green has identified but which Attariwala claims are not in her possession, custody, or control.

In short, Attariwala as not "provid[ed] adequate evidentiary assurances that she no longer possesses, nor can gain access to, Singota's trade secret information." Dkt. 121 at 31-32**.** To the contrary, Attariwala's Declaration contains demonstrably false assertions, demonstrating her continued lack of candor, untrustworthiness, and unreliability.

**A.**      **Attariwala continues to make statements under oath that are untrue and misleading.**

As a general matter, Attariwala's new Declaration [Dkt. 148 at 7-13], signed on February 11, 2020[9] and submitted as part of her Response, is a thoroughgoing exercise in lack of candor at best and perjury at worst. And her continuing lack of "forthrightness" following the Court's entry of the PI extends beyond this Court. On January 16, 2020, Attariwala testified in the United States Bankruptcy Court for the District of Columbia. In her effort to try to persuade that court not to lift the automatic stay under 11 U.S.C. § 362(a) to allow this Court's PI to take effect, Attariwala engaged in perjury, as set out below. Attariwala's Declaration and other conduct since December 18, 2019, do not show that Attariwala has turned over a new leaf and become a credible witness whose assurance can reasonably be relied upon.

**1.**      **Attariwala attempts to manufacture a new false narrative regarding her failure to comply with the state court's preliminary injunction.**

As just one of many examples of Attariwala's continuing dishonesty, Attariwala appears to try belatedly to excuse her failure to produce certain responsive accounts and devices by concocting a new narrative concerning non-compliance with the Indiana State Court's preliminary injunction. Attariwala now claims that "[b]ased on Rebecca Green's in-court testimony on March

---

[9] Attariwala misdated her Declaration as signed in 2019 rather than 2020.

4, 2019, I understood the resulting order to include only certain devices or accounts—those devices named by Ms. Green, which were suspected of containing Singota electronically-stored information ('ESI') or being connected to a device that did." Attariwala Decl. ¶ 3. She further declares that "[m]y understanding at that time (on March 4, 2019) was that Singota had no interest in devices or accounts which had not been identified by Ms. Green or were not suspected of containing Singota ESI or being connected to devices that did." *Id.* ¶ 4. She continues that "[a]t the time in March 2019, I believed that these devices and accounts [that she did produce] fully satisfied Ms. Green's requests and my obligations under the Stipulated Injunction." *Id.* ¶ 10. Finally, she declares that "[b]y the end of the April 18, 2019, hearing, it had become clear to me that the Stipulated Injunction applied to more devices and accounts than I previously realized." *Id.* ¶ 11.

Attariwala's attempt to re-write history in these Declaration paragraphs is absurd. Attariwala now suggests that she failed to produce some accounts and devices that Green later discovered only because they had not been "named by Ms. Green" previously. *Id.* ¶ 3. But the Indiana State Court's Stipulated Preliminary Injunction, which Attariwala ***agreed to with the assistance of her counsel on March 4, 2019***, expressly ordered Attariwala:

> within twenty-four (24) hours of issuance of [the] order . . . [to] make available for inspection by Rebecca Green of The ESI Team ***any and all personal computers, hard drives, or other electronic storage devices and media devices,*** including servers, email accounts, cloud accounts, cell phones, smart phones, and tablets, used to store electronic information in her possession, custody or control, ***including, but not limited to, all computers, devices, accounts, and media identified by Ms. Green pursuant to her analysis of Ms. Attariwal's electronic store media.***

Stipulated Preliminary Injunction ¶ B(5) [Dkt. 4-1 at PageID #: 104]. There was no ambiguity or qualification in this order, which Attariwala agreed to. The state court's preliminary injunction ordered Attariwala to produce "any and all" devices and accounts because any one of them could

20

be used to save a copy of the Singota data she had misappropriated. Every device and account that Attariwala had, regardless whether it was first identified by Green, could contain Singota ESI, which is why Attariwala was required to disclose *every* account and device to Green for her analysis for the presence of Singota ESI. The plain language of the state court's stipulated preliminary injunction required this comprehensive disclosure and production. Notably, Attariwala was represented by counsel at the time she agreed to the order, and she certainly understood the preliminary injunction's plain language.

Attariwala's claim that "[a]t the time in March 2019, I believed that these devices and accounts [that she had produced] fully satisfied Ms. Green's requests" is a fairytale.  In reality, during this time in March 2019, Green exchanged numerous emails and conducted multiple telephone conferences with Attariwala's counsel during which Green identified outstanding accounts, devices, and information that she sought from Attariwala. These lengthy but unproductive exchanges between Green and Attariwala's counsel seeking Attariwala's compliance led to Singota's seeking contempt sanctions against Attariwala and are recounted at length in Singota's briefing and Green's supporting declarations. *See* Mem. Supp. Pl.'s Mot. Order Show Cause Why Def. Should Not Be Found in Contempt at 16-31 [Dkt. 4-1 at PageID ##: 187-202]. The evidence shows, contrary to Attariwala's new Declaration, that Attariwala certainly knew in March 2019 based on these ongoing discussions with Green that what she had so-far produced fell far short of "fully satisf[ying] Ms. Green's requests."

Finally, Attariwala's assertion that "[b]y the end of the April 18, 2019, hearing, it had become clear to me that the Stipulated Injunction applied to more devices and accounts than I previously realized" [*Id.* ¶ 11] is patently absurd because ***Attariwala was not present at the April 18, 2019 hearing.*** [*See* Dkt. 121 at 11.] Instead, in defiance of the state court's order for her to

21

appear for the hearing on April 18, 2019, and to bring with her a long list of outstanding account information and devices identified by Green, Attariwala was a no-show, leading the state court to issue a warrant for her arrest on a finding of direct contempt. *Id.* The record further shows that Attariwala's response to the April 18, 2019, hearing was not to produce "more devices and accounts" but rather to remove the action to federal court to evade further contempt sanctions. [*See* Dkt. 121 at 11.]

Attariwala's new narrative regarding her contempt of the state court's preliminary injunction (perhaps manufactured for presentation to the District of Columba Bankruptcy Court which is unfamiliar with the long and complex history in this case) is refuted by the state court's record, including the parties' filings, Green's multiple declarations and reports, the hearing transcripts, and the state court's Findings of Fact, Conclusions of Law, and Order on Plaintiff's Motion for Order to Show Cause Why Defendant Should Not Be Found in Contempt ("Contempt Order"). [Doc. 15-6.] In the Contempt Order, for example, the state court "held that Ms. Attariwala had intentionally obstructed the litigation and Singota's ability to recover its confidential information" and determined that Attariwala's conduct warranted "severe sanctions," including a default judgment. [Dkt. 121 at 14.][10]  Attariwala's attempt now to try to recast her lengthy record of defiance and contempt during the early months of this litigation as simply a misunderstanding continues Attariwala's refusal to demonstrate candor or to take responsibility for her misconduct. Attariwala's revisionism should do nothing to persuade the Court to rely on Attariwala's newest assurances in her Declaration as a basis for modifying the PI.

---

[10] Although the state court's Contempt Order was later vacated because that court lost jurisdiction following Attariwala's removal to this Court [Dkt, 121 at 14], that order contrasts starkly with Attariwala's new narrative regarding her failure to comply with the state court's preliminary injunction.

    2.      **Attariwala attempts to manufacture a new false narrative regarding her theft of Singota's trade-secret, confidential, and proprietary information.**

In the same vein, Attariwala's Declaration continues Attariwala's recent efforts since approximately October of 2019 to revise the uncontested record regarding the content and scope of the information Attariwala misappropriated from Singota.

    a.      **The "Jessie Docs" folder**

In her Declaration, Attariwala attempts to downplay the significance of the "Jessie Docs" folder that she created during her final days of employment by Singota and repeatedly copied (including one copy ***that remains unaccounted for***). She states that "[t]o the best of my knowledge, this folder contained recipes for my dessert business, Honey Ji; personal information related to my income and taxes; files from Singota which would support the claim that I was not paid for commissions earned in 2018, and possibly other files." Attariwala Decl. ¶ 24.

In reality, the undisputed evidence shows that four minutes after Attariwala emailed her acceptance of Emergent's job offer on December 11, 2018, Attariwala created the "Jessie Docs" folder on her Singota Microsoft Surface tablet ("Singota Surface"). Report of Rebecca Green ("Green Report") [85-2]  37-38.) Attariwala created a number of subfolders within "Jessie Docs," including subfolders that she titled "Company names" and "Leads," among others. (Green Report ¶¶ 39-44.) Attariwala copied six reports that she had just run from Singota's CRM database into the "Leads" subfolder in "Jessie Docs." (Green Report ¶¶ 41-44.) Over the following days, Attariwala copied numerous additional lists of business development leads from Singota's computer systems into her "Jessie Docs" folder, along with other confidential, proprietary, and trade secret documents. (Green Report ¶¶ 45-48.)

Green later found that "[b]etween December 11, 2019 and December 19, 2019, Attariwala populated the Jessie Docs folder with some personal items, as well as over 15,250 Singota emails,

email attachments, and documents belonging to Singota." (Green Report. ¶ 191.) In analyzing the Seagate drive to which Attariwala copied the "Jessie Docs" folder, Green found, in addition to the thousands of documents in Attariwala's email, "over 250 documents which appear to be ESI belonging to and harvested from Singota," including confidential documents such as business development opportunities, client contact lists, detailed lead worksheets, price quotes, compound data sheets, client research and development documents, manufacturing and packaging technique plans, leadsheets, and customer computer aided design (CAD) drawings. (Green Report ¶ 48.) In particular, Attariwala's Seagate contained numerous confidential Singota spreadsheets containing leads, including, for example, "DC Area Leads JKS," "San Diego Area Leads October 2017," "Contract Pharma Leads 2016," and "DCAT 2017 Jessie and Will Leads," among many others. (Green Report ¶¶ 82-88.)

Attariwala's new suggestion in her Declaration that the Jessie Docs folder primarily contains recipes and other personal documents, along with some documents to support an alleged claim for "commissions," is nonsensical.[11] The folder contains massive amounts of information relating to Singota's clients and prospective clients, including leads compiled by other Singota personnel. This Court has already found that the "Jessie Docs" folder contains an extensive amount of Singota's trade-secret and confidential information. [Dkt. 121 at 15.]

### b. **Attariwala's new assertion that she stole Singota's data to support a claim for commissions**

After initially denying she had taken Singota's data and then implausibly claiming she only took client and prospect information to have contact information for "friends," Attariwala has

---

[11] Attariwala does not raise any new genuine dispute concerning the contents of the "Jessie Docs" folder, which were established by Green's expert reports as noted above, However, if the Court were to believe there is any doubt about the contents of "Jessie Docs," Singota respectfully would seek leave to submit the contents of that folder for *in camera* review.

recently begun to test-drive a new excuse for her massive misappropriation: she only took data to try to support an alleged claim for commissions against Singota. Attariwala states in her Declaration that she took "files from Singota which would support the claim that I was not paid for commissions earned in 2018." Attariwala Decl. [Dkt. 148] ¶ 24. She further declares that "I now understand that I should have pursued my wage claim against Singota and my departure from the company in a different way." *Id.* ¶ 45.

Attariwala's after-the-fact attempt to rationalize her theft from Singota as an effort to support a claim for alleged commissions is refuted by the evidence. First, Attariwala never offered this excuse in January 2019 in responding to Singota's cease-and-desist letter and demand for the return of its information (when she simply denied any misconduct), in her answers to Singota's initial or amended complaints, in her response to Singota's initial motion for preliminary injunction, in any of the evidentiary hearings conducted in Indiana State Court, or even in her own deposition in July 11, 2019. Attariwala seems to have hit upon this possible rationalization only in the fall of 2019 in the course of responding to Singota's motion for further injunctive relief, nearly eleven months into this matter. The evolution of Attariwala's denials and rationalizations show they are unworthy of credence.

Second, the contents, scope, and timing of Attariwala's theft of Singota data refute her new excuse that she took information to support an alleged claim for commissions. As noted above, the "Jessie Docs" folder contains an extraordinary amount of Singota information, much of it relating to clients, prospective clients, her own leads, and leads of other Singota employees, among other information. The undisputed evidence also shows that Attariwala created the "Jessie Docs" folder within minutes of accepting her Emergent job offer. The evidence shows that at the same time she created and populated the "Jessie Docs" folder with Singota's data, she also used Singota data to

create a Googledocs spreadsheet titled "Leads – Emergent," a document obviously intended for use on behalf of Emergent to pursue business leads. And during this same time, Attariwala was emailing Singota clients and prospects to inform them that she was moving to Emergent and would contact them after she commenced her employment there.  The only reasonable inference from all of this evidence regarding Attariwala's theft of Singota information is the one this Court has already drawn:

> THE COURT: . . . She took it because she was trying to prepare herself for her next employment so she would be as successful there as she had been previously, and that she would have a running start on the kind of client contacts that she wanted to make because she made contacts with potential friends that she says "I'll be back with you after I get my feet under me."

Dec. 4, 2019 Tr. at  54:14- 55:6.

Finally, Attariwala's new story that she stole Singota's data to try to support a claim for allegedly unpaid commissions is baseless, among other reasons, because Attariwala was never paid commissions by Singota. Contrary to her new theory that she was due an additional bonus or commissions for 2018, Attariwala admitted during her deposition on July 11, 2019, that she understood no incentive plan was in place covering her during 2018. (Attariwala Dep. at 116:8- 10, 116:23–118:1, 132:19-133:12, 134:16-23, 172:14-173:3.) She also admitted that there is no reference to "commissions" in her offer letter (Attariwala Dep. at 48:3-24), employment agreement (Attariwala Dep. at 55:1-56:8), or the business development incentive and award plans that covered her for 2016 and 2017 (Attariwala Dep. 110:1 – 111:14, 114:13-23), despite the fact she mischaracterized these bonus plans as her "commission structure (Attariwala Dep. at 55:12-21). Attariwala's alleged claims for commissions or any additional bonus is baseless.

### 3.      Attariwala's perjury in the D.C. Bankruptcy Court

After the Court issued its PI Order and PI on December 18, 2019, Attariwala testified on January 16, 2020, in a hearing in the D.C. Bankruptcy Court. She opposed Singota's motion asking

that Court for relief from the automatic stay triggered by her bankruptcy petition under 11 U.S.C.

§ 362(a). Specifically, Attariwala opposed lifting the automatic stay to allow this Court's PI to go

into effect. Apparently hoping to persuade the D.C. Bankruptcy Court that this Court's PI was

improvidently issued, Attariwala testified as follows:

```
2    Q.   When you left Singota, did you take some
3    electronically-stored information with you?
4    A.   Yes.
5    Q.   Why?
6    A.   Because I thought it would help me get my wages
7    back that I earned, by showing the emails.
```

Tr. of Hear'g on Motion for Relief from Stay Before Hon. S. Martin Teel, Jr. on Jan. 16, 2020

(U.S. Bankr. Ct. D.,C.) ("Bankr. Tr.") at 17:2-7, attached hereto as **Exhibit B**.  She further testified

to that court:

```
12    Q.   Okay.  Rebecca Green (phonetic), who was the
13    Plaintiff's expert, said some pretty damning things
14    about you; are you aware?
15    A.   I'm aware.
16    Q.   Okay.  Have you or your counsel ever had an
17    opportunity to cross-examine her, particularly about
18    some of her assumptions and conclusions?
19    A.   No.
```

*Id.* at 22:12-19. Attariwala's testimony was perjury. First, as set forth above, Attariwala's theft

from Singota extended far beyond some "emails" to support an alleged claim for "wages."  Second,

*on March 4, 2019, Attariwala sat in the Monroe Circuit Court at a hearing observing her*

*counsel cross-examine Green about her assumptions and conclusions*. *See* Transcript of the

Hearing before the Honorable Elizabeth A. Cure, Judge of the Monroe Circuit Court I, on March

4, 2019 at 2, 9, 41, attached as **Exhibit C.** In addition, at another hearing on April 18, 2019,

*Attariwala's counsel again cross-examined Green regarding her assumptions and conclusions*

*presented in support of Singota's motion for contempt*. *See* Transcript of the Hearing before the

Honorable Elizabeth A. Cure, Judge of the Monroe Circuit Court I, on April 18, 2019 at 2, 68,

attached as **Exhibit D**. Finally, Attariwala and her counsel have had the ongoing opportunity to

take Green's deposition at any time in discovery over the twelve months this litigation has been

pending. In short, after this Court issued its PI, Attariwala continues to display a willingness to

say, even under oath, whatever appears convenient to her in the moment.

B.    **Attariwala Response and Declaration fail to provide any reliable assurance that
      Attariwala does not continue to possess or have access to Singota's information.**

In support of its request for a further preliminary injunction containing certain work

restrictions, Singota introduced voluminous expert testimony from Green showing there is a

substantial risk that Attariwala remains in possession of Singota confidential information. [*See*

Dkt. 85, 95.] Green's reports detail numerous instances of copying, obfuscation, and obstruction

by Attariwala and identified devices and accounts that remain outstanding and unaccounted for.

[*See* Dkt. 86-3, 95-1, 111-1.]

Attariwala's Response and Declaration (like her briefing and oral argument) merely assert

that she does not have possession of Singota confidential information. But they fail to provide any

additional information that could reasonably assure Singota or this Court that she does not remain

in possession of or have access to one or more copies of the Singota data she misappropriated.

1.    **Attariwala fails to provide any reliable assurances regarding the missing copy
      of the "Jessie Docs" folder that she made on February 27, 2019.**

This Court found in the PI Order that:

On February 27, 2019, within hours following Singota's initiation of this litigation
on February 27, 2019, Ms. Attariwala copied the entire contents of the "Jessie docs"

folder from her personal tablet **to a location that has yet to be disclosed or discovered**.

Dkt. 121 at 16 (emphasis added); *see also id.* at 28 (noting "at the time of the state court's preliminary injunction hearings, Ms. Attariwala had already created the 'Jessie docs' folder and placed it in no fewer than three locations (**one of which is still unknown**)" (emphasis added)).

Attariwala's Declaration still fails to explain what happened to the missing copy of the "Jessie Docs" folder she created on February 27, 2019. As noted above, the "Jessie Docs" folder contains massive amounts of Singota's confidential information. [Dkt. 85 at 8–9, 15; Dkt. 95 at 2, 9.] Attariwala created a copy of the "Jessie Docs" folder from her personal Surface computer to an undisclosed location on February 27, 2019, *mere hours after this lawsuit was filed*. [Dkt. 86-3 at p. 15.] **To date, Attariwala has still never provided any explanation about what happened to this copy.** Even now, Attariwala simply downplays this issue, and her new Declaration even conflicts with her earlier accounts regarding this missing copy.

For example, during the December 4, 2019 hearing, Attariwala's counsel represented that Attariwala could not remember making any copy of the Jessie Docs folder:

> I have had numerous conversations with her about that. **She doesn't remember doing anything**, but there is another business interest at issue. She owns a business called Honey G, and there was – **to the best of her knowledge and recollection, she doesn't remember making a copy** but she may have made a copy – and I've communicated that to Mr. Murray – either for purposes of trying to save those business records and it got too broad, or for purposes of providing or saving documents for the wage claim, **but wherever that copy exists, she doesn't have it anymore.**

Dec. 4 Tr. at 9:16-25.

Now, after disavowing any recollection of creating a copy of the "Jessie Docs" folder, Attariwala claims that she does recall making such a copy on February 27, 2019:

> 21.    In addition to the search efforts described above, I have taken ample time to thoroughly and carefully reflect on my activities at times relevant to this litigation.

22.     As a result, and to the best of my knowledge, I recall that I copied the "Jessie Docs" folder identified by Ms. Green on or around February 27.

[Dkt. 148 ¶¶ 21–22.] She further asserts that on November 21, 2019, she "assure[d] [Singota's counsel] and Green that I did not have any access to or copies of 'Jessie Docs.'" *Id.* ¶ 26. But Attariwala's new Declaration still fails to answer the critical questions:

- **Where is this missing copy of the "Jessie Docs" folder?**

- **To what device or cloud account did she copy it on February 27, 2019?**

- **At what point does she contend she lost possession or access to it?**

- **Why did she fail to disclose this copy just days later when she provided a list of accounts and devices to Green following entry of the March 4, 2019 preliminary injunction?**

Attariwala's Response and Declaration fail to provide any information regarding this missing copy of the Singota data she misappropriated. This is not a minor issue. The "Jessie Docs" folder contains everything she stole form Singota. She acknowledges making a copy of it on February 27, 2019, but she cannot provide any information regarding where that copy is.   Simply saying she does not remember what happened to the February 27, 2019 copy of all the Singota data she stole, but be assured she does not have it now, is not a sufficient assurance by a long shot. Without a meaningful (and verifiable) explanation of what happened to the February 27, 2019 copy of the "Jessie Docs" folder, Attariwala has failed to come close to providing a reliable assurance that she no longer possesses it or have access to it..

### 2.     <u>Attariwala fails to provide any new information or reliable assurances regarding the missing WD MyBook Drive.</u>

Similarly, Attariwala's Response and Declaration fail to provide any reliable assurance or information concerning another missing device identified by Green: the WD MyBook drive. As

detailed in Green's October 10, 2019 report, Attariwala failed to disclose or produce a WD MyBook hard drive that was connected to her personal Surface computer and could therefore contain Singota information. [Dkt. 86-3 at 161, ¶ 285.] Initially, Attariwala's counsel claimed this device had long previously been destroyed.



Dkt. 95-1 ¶ 34.

Attariwala then adjusted her story. A short time later, she submitted an affidavit again simply stating this drive was allegedly destroyed, although she changed the dates:

> 13.   The Western Digital My Book storage device was destroyed prior to this litigation, in approximately late 2017 or early 2018.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.

Dated: October 24, 2019

Jaspreet Attariwala

Dkt. 92-1 ¶ 13. But Attariwala's story was quickly disproven with computer forensic analysis. Green provided testimony that the missing MyBook had been connected to Attariwala's Surface computer in at least November 2018—i.e., *the very time period when Attariwala began harvesting Singota information*. [Dkt. 95-1 ¶ 32.] Green noted:

32. Artifacts exist on the Microsoft Surface Computer owned by Ms. Attariwala, which she **_began using_** on November 6, 2018, showing that the Western Digital My Book was connected to the Microsoft Surface owned by Ms. Attariwala **on November 6, 2018** as shown here:

Dkt. 95-1 ¶ 32.

In her latest Declaration, Attariwala provides no new information regarding this missing device.  She declares only:

> 31.    One device identified by Ms. Green was a Western Digital MyBook external hard drive. This device belonged to and was used by my husband to store personal and professional files. This device was replaced because it had started to fail, and once replaced, was discarded.

> 32.    I do not recall exactly when the device was disposed of, except that it was sometime before this litigation commenced.

**I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE.**

Dated: February 11, 2019

_____
Jaspreet Attariwala

Attariwala now states that the missing drive allegedly only contained files belonging to her husband, but if that is true, why was it attached to her personal Surface computer? If the device was just discarded sometime after November 2018 (rather than in 2017 or early 2018, as she previously represented), why can she not state who discarded it?  How was it discarded? What was allegedly wrong with the drive that let to its being discarded? Did she (or her husband or anyone else) take the drive to any computer experts to attempt to repair it?  If so, is there any evidence

32

showing that?  All of these basic details – which could potentially be corroborated or disproved – are still missing from Attariwala's story. As of February 11, 2020, Attariwala provides no more information regarding this missing device than she did before the Court issued its PI on December 18, 2019.  One thing that is known, however, is that the WD MyBook is a device that stores electronic data, and thus it could potentially include a copy of the data Attariwala stole from Singota at the end of 2018.

Again, Attariwala's latest filings do not provide any reliable assurances concerning this missing drive, which could contain Singota data.

3.    **Attariwala has not provided Green access to any additional devices or accounts since the Preliminary Injunction was entered.**

In its PI Order, the Court found:

Green has continued to discover other undisclosed email or online storage accounts, including accounts belonging to Ms. Attariwala's husband, that have either been the repositories of Singota information in some form, or have been connected to or accessed on an account or device containing the stolen Singota information. [Dkt. 111-1, ¶ 17]. Meanwhile, **though Ms. Attariwala has asserted on multiple occasions that she has produced everything, additional accounts and devices are later uncovered.** [Dkt. 111-1, ¶ 12].

Dkt. 121 at 17 (emphasis added).

Section III of the PI required Attariwala "and all persons in active concert or participation with her" to provide Rebecca Green "with access to all email accounts and online storage accounts identified as outstanding in Ms. Green's December 3, 2019 report, Dkt. 111-1." [Dkt. 122 at 2.]

Attariwala has not provided access to **any** additional accounts or devices included on Green's December 3, 2019 report. Attariwala also does not provide any evidence to show that these other accounts and devices do not belong to her or are outside her possession, custody or control. Again, Attariwala has failed to provide any reliable assurances that she does not continue

to have access to Singota data as retained in any of the devices or accounts that Green has identified.

**C.**     **Alternatively, the Court should schedule an evidentiary hearing to permit inquiry into Attariwala's testimony in her Declaration.**

If the Court believes that Attariwala has even potentially raised a question about whether the PI should be modified to lift the work restrictions, prior to lifting those restrictions, Attariwala respectfully asks the Court to set an evidentiary hearing to permit Singota and the Court an opportunity to examine Attariwala in person regarding her Response and Declaration. Such examination would allow the Court to observe Attariwala's demeanor and judge her credibility. Or, alternatively, Singota would ask the Court to allow Singota the opportunity to take Attariwala's video deposition for that purpose and to submit to the Court for its review.

## III.     CONCLUSION

Nothing has changed to justify lifting the work restrictions in the Preliminary Injunction. Attariwala has not demonstrated with any reliable assurances that she no longer possesses or has access to Singota's trade-secret and confidential information. [Dkt. 148 at 3–4.] Because Attariwala has not adequately demonstrated that she has complied with the Preliminary Injunction and is no longer in possession of or has access to Singota's information, the Court should decline to modify the injunction. The Court should therefore vacate its March 4, 2020, Modifying Order. In the alternative, the Court should schedule an evidentiary hearing to permit inquiry into whether Attariwala is in compliance. Singota respectfully moves the Court to grant this motion for reconsideration, order the relief requested herein, and award Singota all other just relief.

Respectfully submitted

_s/   Christopher C. Murray_
Christopher C. Murray, Atty. No. 26221-49

34

Susan H. Jackson, Atty. No. 0090924 (OH)
Justin A. Allen, Atty. No. 31204-49
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, Indiana  46204
Telephone:  317.916.1300
Facsimile:  317.916.9076
*christopher.murray@ogletree.com*
*susan.jackson@ogletree.com*
*justin.allen@ogletree.com*

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2020, a copy of the foregoing was sent to the following parties via First Class Mail with a courtesy copy by email.

Jaspreet Attariwala
Simranjit Johnny Attariwala
1390 Kenyon St., NW Apt. 32
Washington, DC  20010

*s/ Christopher C. Murray*

42086071.1