**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| BIOCONVERGENCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASPREET ATTARIWALA | ) | |
| | ) | Civil Action No. 1:19-cv-01745-SEB-TAB |
| Defendant. | ) | |
| | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO ENTER SANCTIONS FOR
CONTEMPT OF COURT ORDERS AND TO AMEND INSPECTION ORDER**

Christopher C. Murray, Atty. No. 26221-49
Justin A. Allen, Atty. No. 31204-49
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, Indiana 46204
Telephone: 317.916.1300
Facsimile: 317.916.9076
*christopher.murray@ogletree.com*
*justin.allen@ogletree.com*

Attorneys for Plaintiff/Counter-Defendant
BioConvergence, LLC d/b/a Singota Solutions

i

## TABLE OF CONTENTS

Table of Authorities ................................................................................................ iv

I.    INTRODUCTION .......................................................................................... 1

      A.    The Inspection Order ............................................................................ 2

      B.    The Failed Premises of the Inspection Order ...................................... 2

      C.    Singota's Inability to Recover Its Data Under the Current Inspection Order .............. 3

      D.    The Need to Amend the Inspection Order ............................................ 4

II.   RELEVANT BACKGROUND ........................................................................ 5

      A.    The preliminary injunction orders and Inspection Order ...................... 5

      B.    The Expenses Order .............................................................................. 8

      C.    Attariwala's Contempt of the Expenses Order from the Outset .................. 9

      D.    Attariwala's Ongoing Contempt of the Expenses Order After Removal .................. 14

      E.    Attariwala's False Claims that She Lacked Funds to Pay for Green's Work ............ 15

            1.    Attariwala's bank statements show she had available funds in 2019 .................. 15

            2.    Since filing bankruptcy, Attariwala has paid her attorney over $40,000 ........... 17

            3.    Attariwala made multiple significant transfers from an undisclosed account ...... 17

            4.    Attariwala presently possesses over $140,000 in retirement accounts ............... 18

      F.    Green's Production of Attariwala's Data to Attariwala's Former Counsel ............... 19

      G.    Green's Production of Limited Data to Singota ...................................... 20

      H.    Attariwala's Refusal to Fund Green's Work After Filing Her Bankruptcy Petition .. 21

      I.    Attariwala's Efforts to Obtain Data in Contempt of the Preliminary Injunctions, Inspection Order, and Expenses Order ...................................... 22

            1.    Attariwala's Adversary Proceeding Against Green in the Bankruptcy Court ...... 22

            2.    Attariwala's Subpoena to Green for the Production of Documents .................... 27

      J.    Attariwala's Contempt of this Court's Preliminary Injunction .................. 27

ii

K.    Cost Estimates for Conducting the Comprehensive Review ...................................... 29

III.   ARGUMENT ...................................................................................................................... 29

   A.    The Inspection Order should be amended .................................................. 29

       1.    Legal Standards ...................................................................... 29

       2.    The Court should amend the Inspection Order to allow Green to provide copies of all data collected from accounts and devices to Singota and its counsel for their review .................................................................................... 31

   B.    Any objections Attariwala might make to amendment of the Inspection Order should be deemed waived as a sanction for her willful contempt of court orders ...... 35

       1.    Legal Standards ...................................................................... 35

       2.    Attariwala should be deemed to have waived any privileges or protections she might assert with respect to the data collected by Green ...................................... 36

CONCLUSION ................................................................................................................ 39

CERTIFICATE OF SERVICE ........................................................................................ 41

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y of the U.S.*,
406 F.3d 867 (7th Cir.2005) ...................................................35

*BioConvergence LLC d/b/a Singota Solutions v. Jaspreet Attariwala*,
No. 1:19-cv-01745-SEB-TAB (S.D. Ind.) ...............................26

*BioConvergence LLC v. Jaspreet Attariwala*,
No. 1:20-mc-00066-SEB-TAB ................................................27

*Canal Authority of State of Fla. v. Callaway*,
489 F.2d 567 (5th Cir.1974) ...................................................31

*Cherdak v. Koko Fitclub*,
LLC, No. CIV.A. 14-10371-IT, 2015 WL 1895992 (D. Mass. Apr. 27, 2015) .....................34

*Everest Nat. Ins. Co. v. Sutton*,
No. CIV.A 07-722(JAP), 2010 WL 147930 (D.N.J. Jan. 8, 2010).........................................31

*Favia v. Indiana University of Pennsylvania*,
7 F.3d 332 (3d Cir. 1993).........................................................31

*Int'l Sch. Servs., Inc. v. AAUG Ins. Co.*,
No. 10-62115-CIV, 2012 WL 4936054 (S.D. Fla. Oct. 17, 2012) .........................................30

*In re Jaspreet Attariwala*,
No. 19-00828 (D.C. Bankr.) ........................................................ *passim*

*Medina v. Microsoft Corp.*,
No. 14-CV-00143-RS (JSC), 2014 WL 3884506 (N.D. Cal. Aug. 7, 2014) ...........................34

*Merrell-Nat'l Labs., Inc. v. Zenith Labs., Inc.*,
579 F.2d 786 (3d Cir. 1978).....................................................31

*MGE UPS Sys., Inc. v. Titan Specialized Servs., Inc.*,
No. 3:04-0231, 2006 WL 3524502 (M.D. Tenn. Dec. 6, 2006) ...............................................30

*Muro v. Target Corp.*,
250 F.R.D. 350 (N.D.Ill. 2007)................................................36

*Novelty, Inc. v. Mountain View Mktg., Inc.*,
265 F.R.D. 370 (S.D. Ind. 2009)........................................35, 36

*PLC Trenching Co., LLC v. Newton*,
   No. 6:11-CV-0515, 2011 WL 13135653 (N.D.N.Y. Dec. 12, 2011) ......................................30

*Ritacca v. Abbott Labs.*,
   203 F.R.D. 332 (N.D. Ill. 2001) .......................................................................................................36

*RPA Intern. Pty Ltd. v. Compact Intern., Inc.*,
   2007 WL 4105725 (S.D. Cal. Nov. 2007) ...............................................................................34

*Schlafly v. Public Key Partners*,
   C 94-20512.................................................................................................................................................34

**Statutes**

11 U.S.C. § 362...................................................................................................................................................21, 38

28 U.S.C. § 1450...........................................................................................................................................8, 30

**Other Authorities**

8A Fed. Prac. & Proc. Civ. § 2044.1 (3d ed.) ..............................................................................31

Fed. R. Civ. P. 26 ...............................................................................................................................................31

Fed. R. Civ. P. 45 ...............................................................................................................................27, 29

Fed. R. Civ. P. 37(b)(2)(A) ........................................................................................................................35

Plaintiff BioConvergence, LLC d/b/a Singota Solutions ("Plaintiff" or "Singota"), by counsel, respectfully submits this brief in support of its Motion to Enter Sanctions For Contempt of Court Orders and to Amend Inspection Order ("Motion"). As set forth below, Singota moves the Court to amend the March 4, 2019 Agreed Order for Inspection of Computers and Electronic Information Storage Devices ("Inspection Order"). [Doc. 4-1 at 97], attached as **Exhibit A**. The Inspection Order was incorporated into this Court's Preliminary Injunction dated December 18, 2019. *See* Prelim. Inj. [Doc.122] at 3.

Because Defendant Jaspreet Attariwala ("Attariwala") has failed to cooperate in the procedures established under the Inspection Order and engaged in ongoing contempt, and because that order is no longer workable in its present form, Singota moves the Court to amend the Inspection Order to allow computer forensic expert Rebecca Green to release to Singota and its counsel all data collected by Green from any and all accounts and devices covered by the order. Doing so will allow Singota and its counsel to identify the Singota data that is contained in or on those accounts and devices.

I.      **INTRODUCTION**

In this litigation, Singota alleges claims against Attariwala, its former employee, for the misappropriation of trade secrets, theft, conversion, and similar claims. The evidence shows that Attariwala wrongfully copied and took with her a large amount of Singota trade-secret, confidential, and proprietary data following her resignation of employment. *See* Am. Compl. [Doc. 30]. Attariwala left Singota to accept employment with one of Singota's competitors, Emergent BioSolutions, Inc. ("Emergent"). Order Granting Plaintiff's Motion for Further Preliminary Injunction ("PI Order") [Doc. 121] at 2. The evidence shows that Attariwala copied a vast amount of data from Singota's computers systems that would be useful to her in her new position at Emergent. *Id.* at 4-6, 10, 15-17.

1

A.      **The Inspection Order**

At the outset of this litigation, prior to removal to this Court, the Monroe Circuit Court ("State Court") entered the agreed Inspection Order to govern Attariwala's production of computer devices and accounts to computer forensics expert Rebecca Green. *See* Doc. 4-1 at 97; PI Order [Doc. 121] at 7. Under that order, Green is charged with collecting, preserving, and analyzing Attariwala's devices and accounts to identify Singota data copied by Attariwala and remediating any such data.

B.      **The Failed Premises of the Inspection Order**

The Inspection Order is based on a number of premises that have failed to occur or no longer apply. First, the Inspection Order assumed that Attariwala would promptly produce to Green all covered devices and accounts after entry of the order on March 4, 2019. Inspection Order at p. 2, first ¶ 3; State Court Stipulated Preliminary Injunction dated Mar. 4, 2019 ("March 4, 2019 PI") [Doc. 4-1 at 91] ¶ 5. That did not occur. Instead, Attariwala continually obstructed that effort. PI Order [Doc. 121] at 28-29, 32.

Second, the Inspection Order assumed that Attariwala would assist Green by "identify[ing] the Storage Locations which may be storing [electronically stored information ("ESI")] responsive to the matter." Inspection Order at p. 2, ¶ 2.  That has not occurred. *See* PI Order [Doc. 121] at 28-29, 31 (noting "Ms. Attariwala's refusal to disclose, or even admit what she has taken even after it was discovered, coupled with her persistent pattern of withholding accounts and devices"), 32.

Third, the Inspection Order assumed that Attariwala would continue to be represented by counsel, who could, as necessary, review data that Green identified as potentially belonging to Singota prior to production of that data to Singota.  *Id.* at p. 7, ¶¶ 23-26. That is no longer the case. Attariwala is now proceeding *pro se*. *See* Order Granting Leave to Withdraw Appearance, Doc. 147. It would be impossible (and unreasonable) for Green to produce *to Attariwala* for her review

2

under the Inspection Order any Singota data that Green recovers from her devices and accounts since Attariwala is prohibited from possessing that data under the preliminary injunctions.

Finally, Attariwala is required to pay for Phase I of Green's work under the Inspection Order, thereby giving Attariwala an incentive to cooperate in making Green's work efficient and cost-effective. *See* March 18, 2019 Supplemental Order Following Preliminary Injunction ("Expenses Order") [Doc. 4-1 at 138]. That did not occur. Attariwala has refused to pay Green's expenses, thereby requiring Singota to advance fees to Green to obtain her work under the Inspection Order. *See* PI Order [Doc. 121] at 11 ("To date, Attariwala has not paid any of Green's expenses, with the exception of $5000 advanced upon entry of the state court's preliminary injunction.")

## C.   <u>Singota's Inability to Recover Its Data Under the Current Inspection Order</u>

The key premises of the Inspection Order have thus failed to be realized. As a result, although Green has received from Attariwala multiple devices and accounts, Singota still does not have direct access to much of the collected data due to the protocols of the Inspection Order.[1] Under the Inspection Order, Singota would be required to proceed unilaterally and to advance fees to Green (since Attariwala has refused to pay them) to search for Singota's data on and in the devices and accounts so far collected from Attariwala. Requiring Singota to advance thousands of dollars in additional expert costs simply to search for and receive the return of *its own stolen data* would be unfair, unjust, and unnecessary. Singota has already advanced extraordinary expert fees to Green, largely to fund her efforts to try to identify devices and accounts that Attariwala failed

---

[1] Under the Inspection Order, Green has produced to the parties some data, including a copy of the "Jessie Docs" folder that contains a large amount of data that Attariwala misappropriated. *See infra* at 21. In addition, Green has disclosed to the parties some documents and files in her various reports filed in this case. *Id.* at 20-21. However, Green has not conducted the comprehensive review of all accounts and devices collected from Attariwala for Singota data as provided under the Inspection Order.

to produce as ordered. PI Order [Doc. 121] at 29. Even if Singota advanced these fees, it would be impossible for Green to provide recovered data to Singota under the Inspection Order because Attariwala no longer has counsel to participate in the review process under the order.

**D.      The Need to Amend the Inspection Order**

To avoid these unanticipated and unjust results, the Court should amend the Inspection Order. Specifically, the Court should order that Green may provide copies of all data she collects from devices and accounts covered by the Inspection Order to Singota and its counsel for their direct review. This outcome would allow Singota to search for Singota's emails, documents, and files on these devices and accounts without being required to advance additional substantial experts' fees to Green for her to review the data merely so Singota can obtain the identification and return *of its own property*.

Under Singota's proposed amendment, all of the other provisions of the Inspection Order would remain in place. Specifically, Green would still be charged with collecting and holding Attariwala's accounts and devices for purposes of preserving them. Green will also be responsible for identifying and collecting additional outstanding devices and accounts. Green would also conduct any expert-required forensic analysis that is beyond the skills of non-experts. Additionally, if Attariwala seeks the return of any of her accounts, devices, and data, she would be required to follow the Inspection Order, including paying the costs for Green to conduct any review for Attariwala's benefit, unless Singota, based on its own review, informs Green and Attariwala that it has not found any Singota emails and documents in a particular account or device and authorizes Green to release it back to Attariwala without further expert review by Green.[2]

---

[2] To be clear, under this proposed amended Inspection Order, Singota would have no obligation to review accounts and devices for Attariwala's benefit.

Singota's proposed amendment of the Inspection Order will allow Singota finally to comprehensively review the accounts and devices collected by Green. The proposed amendment is fair, especially considering Attariwala's obstruction and refusal to abide by the Inspection Order and Expenses Order's terms. Such amendment will allow Singota to take further steps to identify, recover, and protect its data and will help to advance this litigation on the merits. Finally, the proposed Amendment will not unduly prejudice Attariwala. She and her former counsel had ample opportunity to review much of the data and devices collected by Green prior to her former counsel's withdrawal from this litigation. In addition, Singota and its counsel will treat all non-Singota-related data in the devices and accounts provided by Green under the proposed amendment as confidential subject to the Stipulated Protective Order entered on June 26, 2019. [Doc. 26.]

## II.    RELEVANT BACKGROUND

### A.    The preliminary injunction orders and Inspection Order

On March 4, 2019, the State Court entered a Stipulated Preliminary Injunction that:

(5)    order[ed] that within twenty-four (24) hours after the issuance of this order, Attariwala, and anyone acting in concert or participation with her, shall make available for inspection by Rebecca Green of The ESI Team any and all personal computers, hard drives, or other electronic storage devices and media devices, . . . . Green, acting as an officer of the court, shall conduct an inspection of these devices, media, accounts, and computers in accordance with the Agree Order for Inspection of Computers and Electronic Information Storage Devices entered in this action and incorporated herein by reference. . . [and]

(6)    order[ed] Attariwala not to reconstitute, recover, or in any way restore any of the Company's Confidential Information returned to the Company pursuant to this Order, including, but not limited to, by retrieving any such Confidential Information conveyed by Attariwala to any third-party. . . .

March 4, 2019 PI [Doc. 4-1 at 91] ¶¶ 3, 5 & 6.

In addition, the State Court issued the Inspection Order on March 4, 2019. [Doc. 4-1 at 97.] The Inspection Order sets out detailed procedures for Green's work and a protocol for Green's collection and inspection of devices and accounts. It states in relevant part:

5

2.      Rebecca Green of ESI Team ("Green") is appointed to inspect the ESI Locations pursuant to the terms of this Agreement. . . .

3.      The Defendant shall make available for inspection any and all Storage Locations, including all Accounts and Devices used to store electronic information in her possession, custody or control, including, but not limited to, all computers and devices which may contain ESI relevant in the matter or was connected to a personal computer or device which is known to contain ESI responsive in the matter. . . .

IDENTIFICATION OF ORIGINAL EQUIPMENT AND STORAGE LOCATIONS

1.  Electronically Stored Information (ESI) can be stored in multiple locations. . . .

2.  **All efforts will be made by the Defendant to identify the Storage Locations which may be storing ESI responsive to the matter.**

3.  Because ESI can be transferred inadvertently as well as intentionally, the Defendant will identify all ESI Storage Locations which may contain ESI responsive in the matter [including computers, devices, and accounts] . . . .

4.  Examination of the ESI stored on the Storage Locations identified in protocol may lead to the identification of other Storage Locations which may be storing potentially responsive ESI. . . .

5.  A list of the Storage Locations, including but not limited to all Devices and Accounts, will be [compiled] by the Defendant and will be provided to all counsel and to Green within 48 hours of the parties' agreement to this protocol.

DEFENDANT TO ALLOW DEVICES AND ACCOUNTS TO BE EXAMINED BEFORE ACCESS

…

7.  **Green will determine the order of priority that Storage Locations** will be examined based on information supplied by Defendant.

   a.  If no ESI responsive to the matter is located, Green will communicate to the Defendant and all counsel that, based on the search parameters provided to her, no ESI responsive in the matter was identified.

. . .

10.     Industry standard tools, methodologies, and/or best practices will be used to collect the ESI from the devices in a sound manner preserving the ESI content and its metadata.

. . .

    d.  If Singota's Confidential Information, Protective Information, Trade Secrets or Property, as defined in the Temporary Restraining Order or Preliminary Injunction is found on any mirror image of a hard drive, device, or media the parties will meet and confer in good faith to develop a protocol for the permanent removal of Singota's Confidential Information, Protective Information, Trade Secrets, and/or Property.  If agreement cannot be reached, either party may seek the intervention of the court.

. . .

EXAMINATION

17.    The collected ESI will be examined using industry accepted tools, methodologies, and/or best practices. . . .

19.    Green will analyze the activity for the following possibilities:

    a.  The presence of Singota information.

    b.  The access of Singota information.

    c.  The transfer of Singota data to another device or storage location, including a personal computer, or another portable device or media such as USB drive, CD, DVD, etc.

    d.  Forwarding of Singota information to another party via email or some other electronic transfer means.

    e.  Printing of Singota information which would make the information now portable via paper.

    f.  The deletion of information.

20.    If Singota data is located, Green will make a recommendation for removing the ESI from the Defendant's devices or accounts. . . .

THE DEFENDANT'S DATA IDENTIFICATION AND VERIFICATION

23.    **Green will provide a list of files identified as potentially responsive to both parties' counsel**, including file name, harvest location, created, modified and accessed dates, as well as common metadata field.

24.    **Before Green communicates the contents of any files located on the Defendant's Storage Locations to opposing counsel, the Defendant and their counsel will be given three (3) days to review those files from the Storage Locations for the Defendant's personal information**.

25.    **If the Defendant or their counsel in good faith identifies personal information among the files Green wishes to communicates to**

**Plaintiff's counsel, the Defendant's counsel will direct Green to not produce those files and instead produce a log of those files identifying**:

    a.  Name, path and any other metadata available to Green by her forensic tools as long as the metadata does not reveal the contents of the file.

    b.  The reason the file is deemed personal and confidential.

    c.  *Provided, however*, that no information related to Singota will be deemed personal information of Defendant; and if the parties dispute whether the contents of files should be produced to Plaintiff's counsel, the parties may seek intervention of the Court.

26.    Green will provide to Plaintiff's counsel the above described log along with any other file not deemed by the Defendant or their counsel as containing personal information.

*Id.* at pp. 1–7 (emphasis added).

On April 30, 2019, Attariwala removed this case to this Court. [Doc. 1.] Following removal, all of the State Court's injunctions and orders remain "in full force and effect." 28 U.S.C. § 1450. In addition, when this Court issued its own Preliminary Injunction on December 18, 2019, it expressly incorporated the State Court's preliminary injunction order and its Inspection Order. *See* Prelim. Inj. ("Dec. 18, 2019 PI") [Doc.122] at 1 & 3. This Court's preliminary injunction expressly re-affirmed that Attariwala continues to be enjoined from "possessing, transmitting, using, copying, or disclosing to others Singota's confidential information or trade secrets." [Doc. 122 at 2.]

**B.    The Expenses Order**

In addition, the State Court, at the close of its preliminary injunction hearing on March 4, 2019, orally ordered that Attariwala is responsible for the costs for Phase I of Green's work under the Inspection Order. The State Court memorialized that direction in a written order on March 18, 2019. *See* March 18, 2019 Supplemental Order Following Preliminary Injunction ("Expenses Order") [Doc. 4-1 at 138]. Phase I is defined to include Green's efforts to "**identify, collect and**

**review computers and other electronic storage devices and accounts from Defendant for inspection and, if necessary remove or delete Plaintiff's confidential information from those devices or accounts, in addition to other work incidental to these tasks**[.]" *Id.* at 1.

**C.      Attariwala's Contempt of the Expenses Order from the Outset**

After initially providing some, but not all, devices and accounts to Green, Attariwala refused to cooperate in Singota's efforts to recover and protect its trade secrets and confidential information.[3] *See* Memorandum in Support of Plaintiff's Motion for Order to Show Cause Why Defendant Should Not Be Found in Contempt ("Contempt Brief") [Doc. 4-1, beginning at PageID #172] at 2-3. After producing several devices and accounts, Attariwala paid Green a retainer of $5,000 and demanded that Green spend her time analyzing a MacBook and an I-Phone that Attariwala wanted promptly returned. *Id.* at 16. Green determined that the MacBook contained far more Singota data than Attariwala's counsel represented would be found. *Id.* In her declaration filed in State Court, Green explained:

16.   Ms. Attariwala's counsel had previously requested that I first focus my attention on analyzing the MacBook to attempt to return it as quickly as possible. Ms. Attariwala's counsel represented to me that the MacBook likely would not contain significant Singota information.

17.   In analyzing the MacBook, however, I received over 10,000 hits when running a keyword search on the terms "singota," "bioconvergence" and "bioc." I also identified a user account on the MacBook named "jessie" that contained email and calendar items with hundreds of hits on the term "Singota."

18.   On March 21, 2019, I sent an email to counsel for Ms. Attariwala and for Singota requesting that we schedule a time to discuss the MacBook. I noted that due to the Singota information I was finding on the MacBook, we needed to discuss how best to unravel these items.  . . .

---

[3] A detailed account of Attariwala's conduct between March 4, 2019, and April 15, 2019, is set forth in Singota's Memorandum in Support of Plaintiff's Motion for Order to Show Cause Why Defendant Should Not Be Found in Contempt ("Contempt Brief").  [*See* Doc. 4-1, beginning at PageID #172].

*Id.* Over the following weeks, Green and Attariwala's counsel exchanged numerous emails and conducted multiple telephone conferences regarding these issues. *Id.* at 16-30. Green informed Attariwala's counsel that the costs for processing the MacBook were going to be more than initially expected due to the volume of Singota information she was discovering. *Id.* at 18. At the same time, Green was discovering evidence of accounts and devices that Attariwala had failed to disclose to her. *Id.* 17-18, 21-22. Green explained in her declaration:

> 30.   I participated in a conference call with counsel for all parties on March 25, 2019. At the outset of that call, I again informed Ms. Attariwala's counsel that I needed login information for the additional email accounts I had discovered. I also informed them that I needed login information for any cloud accounts associated with those email accounts. I also yet again explained that I had received over 10,000 hits on "Singota" on the MacBook. I told the parties that I did not believe that I could identify and remove all of the Singota data from the MacBook for the $5000 that Ms. Attariwila had provided me as an initial retainer. I explained the initial retainer amount assumed there was no Singota data on the MacBook based on her counsel's representations to me when they provided the MacBook. I said that we needed to discuss alternatives.

*Id.* at 18.

During this time, on March 28, 2019, Attariwala's counsel sent Green an email identifying categories of documents that Attariwala and her husband, Sim Attariwala (also known as Sim Singh), wanted Green to find on those devices, including tax documents and data relating to Attariwala's side-business, Honey Ji's.[4] Attariwala's counsel wrote to Green:

> For the MacBook Pro, Jessie and Sim need the following files:
>
> - From Sim's Profile
>   - Desktop folder contents;
>   - iPhoto library file and pictures; and
>   - Adobe Lightroom library file.
>
> - Jessie Profile
>   - Desktop folder contents;
>   - Any and all files related to Honey Ji / Honey Jis / Sweet Jis; and

---

[4] The Honey Ji's information is significant because Attariwala has recently sued Green in bankruptcy court for the turn-over of such information. *See infra* at 22-27.

10

     o  There should be a folder called Personal that has tax documents and maybe Honey Ji information - not certain if it is in documents, desktop, or somewhere else on the hard drive.

Declaration of Christina L. Jack ("Jack Decl.") ¶ 4 & Ex. 1 (Email from J. Butts to R. Green, dated March 28, 2019), attached as **Exhibit B**.

In late March and early April of 2019, Green repeatedly requested that Attariwala replenish the retainer under the Expenses Order. *Id.* For example, on April 2, 2019, Green sent Attariwala's counsel an email noting, among other things, that Attariwala's initial payment of $5000 had been used for the work she had requested be prioritized. Green wrote:

> 4)     The retainer has been exhausted and is summarized below.  Please send an additional $5,000 by Friday, April 5th as I would like to bring closure to this project.
>> Imaging the MacBook - $495
>> Forensic Processing, Conducting Searches on the MacBook, Reviewing Results and Reporting those Results to Counsel on the MacBook - $990
>> Imaging and Processing the iPhone- $495
>> Running Searches, Reviewing Search Results and Reports those Results to Counsel on the iPhone - $990
>> Creating, Downloading, Running Searches and Reviewing those Searches on the jsaini1@gmail.com account - $495
>> Addressing HoneyJI and Reporting those issues to Counsel - $245
>> Conference Calls and Email Exchanges with Counsel - $495
>>
>> (Creating and Sending Recommendations on all the devices for counsel – estimated at one to two hours as I will be making screen shots to ensure there is no misunderstanding - $495 to $990)

*Id.* at 25 (emphasis added).

Attariwala refused to pay Green any further retainers contrary to the Expenses Order. And as Green found evidence of accounts that Attariwala had never disclosed, Green's attention shifted toward identifying devices and accounts that remained outstanding in violation of the State Court's orders. By April 15, 2019, when Singota filed its contempt motion, Green explained:

> 60.     In reviewing my work over the past month since the Court entered the PI Order and Inspection Order, I find that I have spent 50% of my time and half of the initial $5000 retainer payment identifying accounts which had not been previously

disclosed and attempting to accommodate Ms. Attariwala's demands that I prioritize returning certain data to her.

*Id.* at 30.

By mid-April, Green estimated the additional costs of her work would likely be significant due to the volume of Singota information on the devices produced by Attariwala and to Green's need to identify additional devices and accounts that Attariwala had not disclosed. Contempt Br. at 14-15. Green recommended "the depleted retainer be replaced with a payment of $15,000 to continue this work of locating and identifying the ESI which belongs to Singota that Ms. Attariwala and now, as discovered, Mr. Attariwala have stored in their accounts and devices." *Id.* at 15. Green further proposed that "[t]hen, to be received by every Friday, an additional payment of $10,000; which would permit about 20 hours of work to be completed in an expedited manner to allow Singota to determine what client information has been taken by Ms. Attariwala and how it may have been used or shared . . . ." *Id.*

On April 16, 2019, the State Court issued its Order Granting Motion to Show Cause Why Defendant Should Not Be Found in Contempt ("Show Cause Order"). [Doc. 4-1 at PageID # 411.] The State Court ordered Attariwala within 24 hours to pay Ms. Green a retainer of $15,000 to fund her ongoing work and set a hearing on April 17, 2019 for Attariwala to show cause why she should not be held in contempt. *Id.*

The State Court conducted the show cause hearing on April 17-18, 2019. Attariwala failed to comply with the order that she immediately pay Green an additional retainer. Attariwala also failed to appear in person at the April 17 hearing as ordered but joined the hearing remotely. *See* Pl.'s Br. Mot. Further Prelim. Inj. [Doc. 85] at 19. After receiving Green's testimony, the Court ordered that the hearing be continued to the next day and that Attariwala appear in person. *Id.* The State Court also ordered Attariwala to bring all outstanding devices and information subject to the

court's threat to order her to deposit $55,000 with the clerk to fund Green's ongoing work. *Id.* at

20. The State Court explained:

> THE COURT: So for the first month it would be Fifty-five Thousand Dollars ($55,000.00)
> dollars.
>
> DEFENDANT'S COUNSEL: I can tell you it's my understanding Miss Attariwala doesn't
> have that kind of money.
>
> THE COURT: Then she better show up here with every single device she ever even thought
> about using and every single account. . . .

*Id.*

Despite the State Court's orders, Attariwala failed to appear for the hearing the next day,

failed to produce any additional devices and accounts, and failed to pay additional funds to cover

Green's work. *Id.* at 21. Attariwala's counsel represented to the State Court that Attariwala was

instead meeting with bankruptcy counsel. Excerpt of Transcript of the Hearing before the

Honorable Elizabeth A. Cure, Judge of the Monroe Circuit Court I, on April 18, 2019 ("April 18

Tr.") at 3:3–15, attached as **Exhibit C**.[5]

On April 18, 2019, the State Court orally held Attariwala in contempt and issued a writ of

attachment for her arrest. April 18 Tr. at 87:4–23; 92:1–16; PI Order at 11. The State Court

expressed dismay that Attariwala decided to meet with bankruptcy counsel rather than comply

with its order to appear. The Court noted "[w]hen she doesn't show up and sends word she's at the

bankruptcy court, I mean, please. So, I'm more than a little upset." *Id.* at 90:13-15.  Following its

issuance of an arrest warrant for Attariwala, the State Court ordered:

> THE COURT: . . . I want Miss Attariwala to be aware of what's happening . . . if
> she wants to turn herself in and turn this stuff over before she gets arrested and

---

[5] Attariwala subsequently confirmed that she first met with bankruptcy attorney David Lynn on April 18, 2019. Tr.
Telephonic Motion for Relief from Stay Hearing Before Hon. Martin S. Teel, Jr. ("Relief Hearing") at 34:25-35-20
(*In re Jaspreet Attariwala*, No. 19-00828 (D.C. Bankr.)), attached as **Exhibit H**. Notably, she waited eight months
after first meeting with Lynn before she filed her bankruptcy petition on the eve of this Court's entering its anticipated
preliminary injunction barring her from working for Emergent.

> shipped back here . . . , she can purge her, uh, contempt ahead of time . . . . It's
> going to be Fifty-five Thousand Dollars ($55,000.00) in Clerk's account to be used
> for Miss Greene and the extra money and as I okay it and, uhm, the entire wish list
> Miss Greene and if she gives, if there is one piece missing it's not the entire list,
> okay, when I say entire I mean each and every piece. Okay? Because I'm afraid
> we're having someone who's trying to parse the truth into a new form.

*Id.* at 92:1-13. Attariwala failed to comply with the State Court's orders. She neither produced the

additional devices and accounts nor deposited any additional funds to cover Green's work. PI

Order [Doc. 121] at 11. Instead, she removed the case to this Court on April 30, 2019. *Id.*

**D.** **Attariwala's Ongoing Contempt of the Expenses Order After Removal**

Between April 30, 2019, when Attariwala removed this case to this Court, and December

17, 2019, when Attariwala filed her bankruptcy petition, Attariwala never made any further

payments to Green to cover her work under the Inspection Order. *See* PI Order [Doc. 121] at 11

("To date, Attariwala has not paid any of Green's expenses, with the exception of $5000 advanced

upon entry of the state court's preliminary injunction."); *In re Jaspreet Attariwala*, No. 19-00828

(D.C. Bankr.) [Bankr. Doc. 1].[6]

During the December 4, 2019, hearing on Singota's motion for further preliminary

injunctive relief, this Court observed that Attariwala was in default of the Expenses Order, stating:

| | |
|---|---|
| THE COURT: | Mr. Jefferson? Why wasn't the $55,000 posted? |
| MR. JEFFERSON: | She can't afford it. |
| THE COURT: | Oh, did you tell that to the court? |
| MR. JEFFERSON: | Not yet, Your Honor. |
| THE COURT: | Wasn't the gist of that order that the 55,000 – I mean the Court didn't say pay – put up $55,000 if you can afford it, right? There was no request for relief from that, right? She's clearly in default of that, right? |
| MR. JEFFERSON: | Yes, Your Honor, in terms of the expenses – |

---

[6] References to docket entries in Attariwala's bankruptcy case are to "Bankr. Doc."

14

| THE COURT: | It sounds like the hole that she dug by taking the documents just keeps getting deeper and deeper, especially if she has to pay Ms. Green's fees. |
| MR. JEFFERSON: | Yeah, I think those are Ms. Green's fees, and I agree the hole's pretty deep. *I would also represent to the Court that Mrs. Green is not the only one not getting paid.* |
| THE COURT: | I bet. We talked about that the last time you were here. |

Tr. Hearing Before Hon. Sarah Evans Barker on Dec. 4, 2019 ("Dec. 4, 2019 Tr.") at 46:9 – 47:2

(emphasis added), attached as **Exhibit D**.

**E.**     **Attariwala's False Claims that She Lacked Funds to Pay for Green's Work**

Attariwala has repeatedly attempted to excuse her contempt of the Expenses Order by

claiming she lacked the funds to pay Green to perform work under the Inspection Order. However,

Attariwala has recently produced records in her pending bankruptcy case that show her

representations that she lacked funds in 2019 to pay Green were false. *See generally In re Jaspreet*

*Attariwala*, No. 19-00828 (D.C. Bankr.).

    **1.**     **Attariwala's bank statements show she had available funds in 2019.**

As set forth in Singota's recently filed Expedited Motion to Stay Entry of Order

Confirming Chapter 13 Plan ("Motion to Stay Confirmation") in the bankruptcy case, Attariwala

produced some banking statements on August 31, 2020.[7] *In re Jaspreet Attariwala*, No. 19-00828

(D.C. Bankr.), Doc. 124-1 at 2. Those banking statements show, among other things, that:

- At the end of March 2019, when Attariwala was refusing to make any additional payments to Green following exhaustion of the initial $5000 retainer, Attariwala's Chase banking statements show that she had **$44,454.87** in her checking and savings accounts, *see id.* at PDF Page 224 (Jack Decl. ¶ 5 & Ex. 2);

---

[7] Additional banking statements, which were the subject of a motion to compel, remain outstanding.

- As of April 30, 2019, when Attariwala was in contempt of the State Court's April 16, 2019 Order that she make an immediate payment to Green of $15,000, Attariwala's Chase banking statements show she had **$45,668.66** in her checking and savings accounts, *id.* at PDF Page 218 (Jack Decl. ¶ 6 & Ex. 3);

- On May 24, 2019, Attariwala, instead of complying with the Expenses Order and other orders, paid her then-attorneys, McNeely Stephenson, **$25,000.00**, *id.* at PDF Page 214 (Jack Decl. ¶ 7 & Ex. 4);

- On July 5, 2019, Attariwala made another payment to her then attorneys, McNeely Stephenson, of **$2,600**, *id.* at PDF Page 208 (Jack Decl. ¶ 8 & Ex. 5);

- On July 5, 2019, Attariwala paid her bankruptcy attorney, David Lynn, **$1000**, *id.* at PDF Page 208[8] (Jack Decl. ¶ 8 & Ex. 5);

- On July 8, 2019, Attariwala made another payment to her then attorneys, McNeely Stephenson, of **$2,000**, *id.* at PDF Page 208 (Jack Decl. ¶ 8 & Ex. 5); and

- Beginning July 29, 2019, and continuing through December 16, 2019, Attariwala paid her then-attorneys, McNeely Stephenson, **$400 each week** for a total of **$8,400.00**. *id.* at PDF Pages 185-208 (Jack Decl. ¶ 9 & Ex. 6).[9]

Accordingly, prior to December 17, 2020, when she filed bankruptcy, Attariwala's Chase banking statements show she paid her attorneys at least **$39,000** rather than make payments to cover Green's work under the Inspection Order and comply with the Expenses Order. Attariwala's banking statements show she also made other payments rather than fund Green's work.

---

[8] Notably, this was *over five months before* Attariwala filed her bankruptcy petition on December 17, 2019.

[9] These numerous payments to McNeely Stephenson, including weekly payments of $400 from July 29, 2019, to December 16, 2019, show that Defendant's counsel's representation to this Court on December 4, 2019, that McNeely Stephenson was not being paid were false. *See* Dec. 4, 2019, Tr. 46:24-25 ("I would also represent to the Court that Mrs. Green is not the only one not getting paid.")

2.      **Since filing bankruptcy, Attariwala has paid her attorney over $40,000.**

In her bankruptcy case, Attariwala has filed several reports showing she has paid significant amounts to her bankruptcy attorney, David Lynn, rather than fund Green's work under the Inspection Order. These reports show that Attariwala has paid Lynn:

- $16,430.00 in December 2019, *see* Disclosure of Compensation to Attorney for Debtor, Bankr. Doc. 1 at PDF page 12 of 18, attached as **Exhibit B** (Jack Decl. ¶ 10 & Ex. 7);

- $15,037.00 in May 2020, *see* Supplemental Statement Pursuant to Rule 2016(b), Bank. Doc. 69, attached as **Exhibit B** (Jack Decl. ¶ 11 & Ex. 8); and

- $10,000.00 in October 2020, *see* Supplemental Statement Pursuant to Rule 2016(b), Bank. Doc. 132, attached as **Exhibit B** (Jack Decl. ¶ 12 & Ex. 9).

Accordingly, Attariwala has between December 2019 and the present paid her bankruptcy counsel **$41,467.00** rather than pay Green to perform work under the Inspection Order.

In short, after April 16, 2019, when the State Court ordered Attariwala to make supplemental payments to Green, Attariwala has (so far) paid her attorneys **$80,467** rather than make even a single additional payment to comply with the Expenses Order and fund Green's work under the Inspection Order.

3.      **Attariwala made multiple significant transfers from an undisclosed account.**

Significantly, Attariwala's recently produced banking statements in her bankruptcy case are incomplete. *See* Singota's Expedited Motion to Stay Entry of Order Confirming Chapter 13 Plan ("Bankr. Mot. Stay") [Bankr. Doc. 124-1] (Jack Decl. ¶ 13 & Ex. 10).[10] Notably, Attariwala appears to have had additional sources of funds. Her Chase banking statements show repeated

---

[10] Singota has moved the bankruptcy court to stay confirmation of Attariwala's Chapter 13 plan based on evidence suggesting that she concealed accounts. Those issues remain pending in the bankruptcy court.

transfers from an apparent brokerage account that Attariwala did not disclose on her bankruptcy schedules.  During the past two years, Attariwala received the following transfers:

- $30,000 on February 21, 2018, *see* Bankr. Mot. Stay, at 22;

- **$20,000 on July 5, 2019** (at the time when Attariwala was already in contempt of the Expenses Order and the State Court's April 16, 2019 Order); *id.* at 23; and

- **$12,200.37 on December 3, 2019** (the day before Attariwala's counsel represented to this Court that Attariwala lacked funds to comply with the Expenses Order), *id.* at 23.

At no point did Attariwala use funds from this undisclosed source to pay Green.

**4.  Attariwala presently possesses over $140,000 in retirement accounts.**

Finally, at the time Attariwala filed her bankruptcy petition on December 17, 2019, she held $143,063.35 in retirement accounts. Bankr. Doc. 39 at PDF Page 6 (Jack Decl. ¶ 14 & Ex. 11). Her bankruptcy schedules show:

21. **Retirement or pension accounts**
    *Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans
☐ No
■ Yes. List each account separately.

| Type of account: | Institution name: | |
|---|---|---|
| 401(k) | 401(k) account, in custody of Principal. Amount shown is approximate. | $5,500.00 |
| IRA | Individual retirement account, in custody of JP Morgan Chase.  Account No. . . . 8645. | $94,150.64 |
| Roth IRA | Roth IRA, in custody of JP Morgan Chase. Account No. . . . 1978. | $27,912.71 |
| 401(k) | 401(K) retirement account, in custody of John Hancock.  Amount shown is approximate. | $15,500.00 |

*Id.*  In a bankruptcy court hearing, Attariwala testified that she is willing to make payments under her proposed Chapter 13 plan by using funds from her retirement accounts if necessary. *See* Tr. Telephonic Evidentiary Hearing Before Hon. Martin S. Teel, Jr. on Aug. 21, 2020 ("Confirmation

Hearing") at 9:7-10 (Jack Decl. ¶ 15 & Ex. 12). At no point has Attariwala used or offered to use funds from her retirement accounts to comply with the Expenses Order.[11]

## F.   Green's Production of Attariwala's Data to Attariwala's Former Counsel

After Attariwala refused to pay Green to perform more work under the Inspection Order, Green provided copies of all of the data she had so far collected from Attariwala's devices and accounts to Attariwala's own counsel on September 9, 2019. Green provided this data to Attariwala's former counsel, in part, to allow them to respond to Singota's discovery.

On February 27, 2019, Singota served expedited discovery on Attariwala seeking, among other things, all documents relating to Singota that Attariwala had obtained from Singota, all communications between Attariwala and Singota's clients and prospective clients, and all documents relating to Attariwala's employment application with Emergent. [Doc. 4-1 at PDF Pages 73 & 106.] Attariwala responded to Singota's requests on March 20, 2019, by stating responsive documents were in the possession of Green. [Doc. 4-1 at PDF Pages 397-399.]

Singota's counsel therefore requested that Green provide a copy of the data she had so far collected to Attariwala's counsel for their review so they could respond to Singota's discovery. On September 9, 2019, Green sent a copy of the data she had collected from various devices and several accounts to Attariwala's counsel. *See* Email from R. Green to P. Jefferson et al., dated Sept. 9, 2019 (Jack Decl. ¶ 16 & Ex. 13). Green provided to Attariwala's counsel: a full image of a MacBook computer, data collected from Attariwala's google accounts, and copies of data from Attariwala's personal Surface computer and various external devices including the Seagate drive that contained the Jessie Docs folder. After receiving this data from Green, Attariwala's counsel

---

[11] Despite paying her bankruptcy counsel over $40,000 and possessing over $140,000 in her retirement accounts, Attariwala has also elected not to retain counsel in this litigation.

failed to supplement her responses to Singota's requests. (Jack Decl. ¶ 17.) Attariwala's counsel also never asserted under the Inspection Order that any of this data should be withheld from production to Singota's counsel. Jack Decl. ¶ 18.

**G.      Green's Production of Limited Data to Singota**

To date, Green has provided Singota limited portions of the data she has collected from accounts and devices. On May 25, 2019, Green provided to Attariwala's counsel a number of emails pulled from one of Attariwala's personal email accounts containing documents relating to Singota and Emergent. Email from R. Green to P. Jefferson et al., dated May 25, 2019 (Jack Decl. ¶ 19 & Ex. 14). After Attariwala's counsel had 3 days to review the documents, Green provided them to Singota's counsel on May 31, 2019. These documents included emails that were bates-marked JSA0000001-390 and a number of large spreadsheets containing "leads" that Attariwala had misappropriated from Singota.

On August 5, 2019, Green produced to Attariwala's and Singota's counsel spreadsheets listing files contained on external storage devices produced by Attariwala, including a Seagate external drive. Email from R. Green to P. Jefferson et al., dated Aug. 5, 2019 (Jack Decl. ¶ 20 & Ex. 15.) This Seagate device contains a copy of the "Jessie Docs" folder that Attariwala created on her Singota computer and used to store numerous confidential files she misappropriated from Singota. *See* Report of Rebecca Green, dated Oct. 10, 2019 ("Oct. 10, 2019 Green Rep.") [Doc. 85-2] at p. 4 ¶ 38 – p. 45 ¶ 48; p. 54 ¶ 74 – p. 60 ¶ 88.

On November 25, 2019, Green also provided to Attariwala's and Singota's counsel a copy of the "Leads-Emergent" workbook that Attariwala created using confidential Singota data shortly before the end of her employment. Email from R. Green to P. Jefferson et al., dated Nov. 25, 2019 (Jack Decl. ¶ 21 & Ex. 16 (confidential attachment omitted).)

20

Finally, on November 29, 2019, Green sent an email to Attariwala's counsel informing them that Singota's counsel had requested a complete copy of the contents of the "Jessie Docs" folder, which Attariwala had created on her Singota laptop, populated with confidential Singota data, and then copied to her personal Seagate drive. Email from R. Green to P. Jefferson et al., dated Nov. 29, 2019 (Jack Decl. ¶ 22 & Ex. 17.) Green reminded Attariwala's counsel that she had already provided the "Jessie Docs" folder to them on September 9, 2019, along with all of the other data she had so far collected to that point, and that they had not objected to providing any of those files to Singota. *Id.* Green informed Attariwala's counsel that she would thus provide the "Jessie Docs" folder to Singota's counsel in three days absent any objections. *Id.* Green subsequently provided the "Jessie Docs" folder to Singota's counsel after receiving no objection from Attariwala's counsel. (Jack Decl. ¶ 23.)

Accordingly, although Green provided Attariwala's former counsel copies of all of the data she had so far collected as of September 9, 2019, Singota has only received a fraction of that data.

## H.    Attariwala's Refusal to Fund Green's Work After Filing Her Bankruptcy Petition

Attariwala filed her bankruptcy petition on December 17, 2019. On January 30, 2020, the bankruptcy court lifted the automatic stay under 11 U.S.C. § 362, in part, to allow this Court's December 18, 2019, preliminary injunction to take effect. [Bankr. Doc. 42 at 2.] On June 24, 2020, the bankruptcy court lifted the automatic stay to allow Singota to prosecute this litigation to final judgment.  The bankruptcy court ordered:

> The automatic stay of 11 U.S.C. § 362 is hereby lifted for the purpose of permitting Singota to prosecute the action captioned *BioConvergence LLC d/b/a Singota Solutions v. Jaspreet Attariwala*, No. 1:19-cv-01745-SEB-TAB (S.D. Ind.), pending in the United States District Court for the Southern District of Indiana (the "Underlying Litigation") against the Debtor with respect to the damages claims against her and all other possible relief against her, including injunctions, sanctions, and any other relief deemed appropriate by the Indiana court, to final judgment or resolution (including any appeals taken by any of the parties thereto).

Order Granting Motion for Relief from Automatic Stay to Permit Liquidation of Damages Claims [Bankr. Doc. 88] at 1-2, attached as **Exhibit E**.

Between Attariwala's bankruptcy filing on December 17, 2019, and today, Attariwala has still refused to make further payments to Green to cover her work under the Inspection Order. Attariwala claims without citation to any order or authority that the Expenses Order no longer applies to her following her bankruptcy filing. *See, e.g.*, Email from J. Attariwala to C. Murray dated Sept. 2, 2020 (claiming that the Expenses Order is "a pre-petition debt") (Jack Decl. ¶ 24 & Ex. 18.)  She has thus made clear that she does not intend to comply with the Expenses Order.

I.   **Attariwala's Efforts to Obtain Data in Contempt of the Preliminary Injunctions, Inspection Order, and Expenses Order**

At the same time she has refused to fund Green's work under the Inspection Order, Attariwala has engaged in efforts to force Green to work on Attariwala's behalf without compensation and to return data to her without following the Inspection Order and in contempt of the preliminary injunctions.

1.   **Attariwala's Adversary Proceeding Against Green in the Bankruptcy Court**

In Attariwala's bankruptcy case, Attariwala has demanded that Green return to Attariwala certain accounts and data collected in this litigation under the preliminary injunctions. Specifically, Attariwala has demanded that Green turn over to her various accounts and data allegedly related to her side-business, Honey Ji's.[12] On February 14, 2020, Attariwala's bankruptcy attorney, David Lynn, sent an email to Green demanding that Green give Attariwala access to her Facebook and Instagram accounts (apparently meaning her personal accounts and not accounts only limited to

---

[12] Green found evidence that Attariwala continued to access Honey Ji's information after the State Court issued its preliminary injunction and the Inspection Order and in violation of those orders. *See* Oct. 10, 2019 Green Rep. [Doc. 85-2] ¶¶ 299-300 ("Ms. Attariwala produced her Sony Vaio laptop nearly three months after Judge Cure ordered it to be produced. I found that Ms. Attariwala used it frequently to access information regarding her HoneyJi business").

Honey Ji), an email account for honeyjiscorp@gmail.com, and two cloud accounts, Dropbox and Box, associated with the login, info@honeyji.com. *See* Email from D. Lynn to R. Green, dated Feb. 14, 2020 (Jack Decl. ¶ 25 & Ex. 19.)

There is no dispute that these accounts and data are covered by the Inspection Order and the preliminary injunctions in this litigation. Indeed, Green has already found that some of the devices that Attariwala claimed were used for her Honey Ji's business contain large amounts of Singota data. *See, e.g.*, Supp. Report of Rebecca Green, dated Oct. 31, 2019 [Doc. 95-1] ¶¶ 6-8 (stating that Green found over 15,000 Singota emails, email attachments, and documents on a laptop that Attariwala claimed "was only for Honey Ji business and personal use"). Green has also found evidence that Singota data exists in Attariwala's personal emails accounts. *See, e.g.*, Oct. 10, 2019 Green Rep. [Doc. 85-2] at p. 17 (¶ uu) (noting that Green found "evidence of Singota ESI attached to an email from simandjessie@gmail.com and sent to simjsingh@gmail.com").

On February 19, 2020, Green responded to Lynn that she is required to comply with this Court's Inspection Order. Green wrote: "[a]s I recall the protocol filed in this [Indiana] matter states that no account or device can be returned until the protocol work is complete (collecting, examining, removing ESI that does not belong to her, etc.)." Email from R. Green to D. Lynn, dated Feb. 19, 2020 (Jack Decl. ¶ 26 & Ex. 20.)  Green explained, "That work was suspended when Ms. Attariwala refused to replenish the retainer; nearly a year ago." *Id.* Green also identified a potential path for responding to Attariwala's demand for the allegedly Honey-Ji's-related accounts and data in compliance with the Inspection Order.  Ms. Green stated:

> I would need Singota's approval to carve out just the items below into a separate protocol and my standard retainer of $5,000 would be due to get started.  It is possible that I could complete the work within the retainer, but given I have not examined some of these accounts (because work was suspended when the retainer was depleted), I cannot be certain of that fact until I see the volume.

*Id.* Lynn responded by requesting a copy of the Inspection Order and a "statement of the work performed to date."[13] Green replied that "Ms. Attariwala already has that information."

Lynn did not follow-up on Green's proposal in February 2020 to provide her a retainer of $5,000.00 for the work Attariwala demanded. Instead, on March 5, 2020, Lynn sent Green an email simply re-asserting his demand that she provide the allegedly Honey Ji's-related accounts to Attariwala, apparently without paying Green's fees and costs to review those accounts as required by the Inspection Order. Lynn also threatened to sue Green and demanded that she:

> provide the things requested above to us immediately, failing which we shall have to request the Bankruptcy Court to enter an order to that effect, in which case we would also request an award of attorney's fees and costs for having to do so.

Email from D. Lynn to R. Green, dated March 5, 2020 (Jack Decl. ¶ 27 & Ex. 21.)

On April 23, 2020, Attariwala's attorney followed through on his threat and filed an adversary proceeding against Green in the bankruptcy court seeking a judgment ordering her "to turn over to [Attariwala] all files, accounts and other material relating to Honey Ji that is in the custody or control of Rebecca Green and/or ESI Team, Inc." *Jaspreet Attariwala v. Rebecca Green et al.*, Adversary Proceeding No. 20-10014-SMT (D.C. Bankr. Ct) [AP Doc. 1].[14]

On May 20, 2020, Green sent Lynn an email that, among other things, noted that Attariwala's adversary proceeding demanding that Green transfer the allegedly Honey Ji's-related accounts and documents to Attariwala without following the Inspection Order could place Green in contempt of the Indiana courts' orders. Email from R. Green to D. Lynn, dated May 20, 2020 (Jack Decl. ¶ 28 & Ex. 22.) She added: "I suggest the easiest way to resolve this matter is simply to follow the Agreed Order for Inspection of Computers and Electronic Information Storage

---

[13] The Inspection Order had already been served on Lynn on December 31, 2019, as an exhibit to Singota's Emergency Motion for Relief from Automatic Stay in the bankruptcy litigation. *See* Bankr. Doc. 12 (Ex. 4).

[14] Citations to the docket in Attariwala's adversary proceeding against Green are to "AP Doc."

Devices" in this litigation. *Id.* Lynn responded by accusing Green of dishonesty in claiming there was additional work she would need to perform under the Inspection Order before the data Attariwala demanded could be released to Attariwala. Without pointing to any evidence, Lynn, who is not representing Attariwala in this Court, simply declared: "I conclude that you have had ample time and money to review the 'Honey Ji' material for any Singota-related material. Surely by now you know precisely where the Honey Ji data and related accounts are located." Email from D. Lynn to R. Green, dated May 21, 2020 (Jack Decl. ¶ 29 & Ex. 23.)

Singota has intervened in Attariwala's adversary proceeding against Green to protect its interests. *See* Adversary Proceeding No. 20-10014-SMT (D.C. Bankr. Ct) [AP Doc. 17]. Attariwala's action against Green seeks the turn-over to her of data in violation of the preliminary injunctions and Inspection Order entered in this litigation. For example, the Indiana State Court's preliminary injunction, which was incorporated into this Court December 18, 2019 Preliminary Injunction, expressly ordered Attariwala:

> (6)     **. . . not to reconstitute, recover, or in any way restore any of the Company's Confidential Information returned to the Company pursuant to this Order**, including, but not limited to, **by retrieving any such Confidential Information conveyed by Attariwala to any third-party**.

March 4, 2019 PI [Underlying Doc. 4-1 at 91] ¶ 6; *see also* Dec. 18, 2019 PI [Doc. 122] at 1.

On September 11, 2020, Singota, after consulting with Green, sent Lynn correspondence noting that Green estimated the costs for her to review the allegedly Honey-Ji's-related accounts and devices under the Inspection Order to be at least $8,525 and likely more. *See* Letter from C. Murray to D. Lynn, dated Sept. 11, 2020 at 11 (Jack Decl. ¶ 30 & Ex. 24.) Green stated she would require a retainer from Attariwala of $10,000 to start the work. *Id.* Attariwala failed to respond.

Significantly, Green is proceeding *pro se* in defending Attariwala's action against her. [*See* AP Doc.] Green is required to appear for scheduling conferences, respond to pleadings, and devote

time to defending Attariwala's action against her all without reasonable compensation for her time as an expert. Green is obviously and justifiably concerned about the burdens and risks of Attariwala's litigation against her. On September, 16, 2020, Green unilaterally proposed that she simply turn over the requested data and accounts to the parties' counsel to review themselves. Email from R. Green to D. Lynn et al., dated Sept. 16, 2020 (Jack Decl. ¶ 31 & Ex. 25)

Green's proposal to resolve the Adversary Proceeding in this manner is not satisfactory to Singota because it would require that Singota either pay its own counsel to review this data for Attariwala's benefit or rely on Attariwala's bankruptcy counsel to review that data for Singota's protection. Neither option would be fair to Singota. Indeed, Attariwala's bankruptcy counsel has not appeared in this litigation and is not subject to the Court's protective order or other orders. However, if this Court grants this motion, *Singota* would receive all collected data from Green and could choose to review the allegedly Honey-Ji's-related data on its own without incurring external expert and attorneys' fees. In those circumstance, if Singota does not find its data in these selected accounts, it could authorize Green to release these allegedly Honey-Ji's-related accounts and documents to Attariwala for purposes of resolving Attariwala's adversary proceeding against Green without further burden on Green.[15]

On October 5, 2020, the bankruptcy court has entered a scheduling order for Attariwala's Adversary Proceeding establishing a schedule for discovery. [AP Doc. 34, attached as **Exhibit**

---

[15] To be clear, by seeking amendment of the Inspection Order to allow Green to release copies of all collected data to Singota and its counsel, Singota **does not** undertake any obligation to review that data for Attariwala's benefit, including for purposes of releasing any devices, accounts, or other data to Attariwala. Singota only notes that if this motion is granted, Singota would have the option of reviewing the allegedly Honey-Ji's-related accounts and documents at its own discretion for purposes of resolving the Adversary Proceeding. Singota would do so solely to avoid further burdens on and costs to itself and to Green, an innocent third-party expert whom Attariwala is unfairly putting in jeopardy of violating this Court's preliminary order and Inspection Order by suing her for the return of data.

**F.**] That order factors in the possibility that this Court might grant this Order allowing Singota to review these accounts and documents.

### 2. Attariwala's Subpoena to Green for the Production of Documents

In addition to suing Green, Attariwala, on August 19, 2020, served Green with a Subpoena to Produce Documents, Information, or Objects or To Permit Inspection of Premises in a Civil Action ("Subpoena") and a Request for Production of Documents and Records to a Non-Party ("RFPs"). *See* Subpoena & RFS, included as **Exhibit G.** This subpoena demanded that Green produce to Attariwala forty-six categories of documents and data. *Id.*

Attariwala's subpoena to Green is improper for many reasons. Significantly, Attariwala is yet again attempting to obtain work to be performed by Green for Attariwala's benefit without compensating Green, Singota's expert witness. Most troubling, Attariwala is attempting to obtain from Green by subpoena data that she is prohibited from possessing under this Court's preliminary injunction and Inspection Order. For example, Attariwala's subpoena demands that Green:

> 1. Produce any and all information and communication (including emails email and text messages) from December 1st 2018 – current between you and McNeely Stephenson (now McNeely Law).

RFPs ¶ 1. If Green complied with this request, Attariwala, in violation of the preliminary injunction and Inspection Order, would receive the return of *nearly all of the data she produced to Green.* As noted above, Green provided Attariwala's former counsel, McNeely Stephenson, *a complete copy of all of the data she had so far collected on September 9, 2019.  See* Jack Decl. ¶ 16 & Ex. 13. Singota has moved to quash Attariwala Subpoena to Green on multiple grounds. *See BioConvergence LLC v. Attariwala*, No. 1:20-mc-00066-SEB-TAB.[16]

### J. Attariwala's Contempt of this Court's Preliminary Injunction

---

[16] Singota filed this miscellaneous action in the District for the District of Columbia, the district where compliance was required, pursuant to Rule 45(d)(3)(A). That court transferred the motion to quash to this Court under Rule 45(f).

27

Finally, Attariwala has still never produced the February 27, 2019 copy of the "Jessie Docs" folder that she made several hours after this lawsuit was filed, putting Attariwala in contempt of this Court's preliminary injunction. *See* PI Order [Doc. 121] at 16-17, 30 (noting that Attariwala "sidesteps the most serious of Singota's accusations and investigatory findings by refusing to answer such questions as: Where did she copy the "Jessie docs" folder on February 27, 2019?"); Dec. 17, 2019 PI [Doc. 122]. Nor has she ever provided any explanation for what happened to that copy. For example, in response to the preliminary injunction, Attariwala admitted only that "I recall that I copied the 'Jessie Docs' folder identified by Ms. Green on or around February 27, 2019." Def.'s Resp. to Prelim. Inj. Ex. A ("Aff. Of Jaspreet Attariwala") ¶ 22. However, Attariwala failed to explain to what device or account she copied the "Jessie Docs" folder and failed to provide any additional information about it. *Id.* She merely claimed that she no longer has access to it. *Id.* ¶ 26. Attariwala's bare denial of having access to this copy of the "Jessie Docs" folder is unpersuasive since she provides no details or evidence to corroborate it.

Singota anticipates moving for contempt sanctions with respect to Attariwala's failure to comply with the preliminary injunction in this regard. Before doing so, Singota has been attempting to conduct discovery on these issues by serving written discovery on both Attariwala and her husband, non-party Sim J. Attariwala a/k/a Sim J. Singh, and scheduling their depositions. However, Mr. Attariwala appears to be evading personal service of Singota's subpoena, with Singota's process server having made at least 17 unsuccessful attempts to serve him at his residence. Singota has therefore recently filed a Motion for Leave to Serve Subpoena by

Alternative Means to seek authorization to serve Mr. Attariwala by certified mail with subpoenas for the production of documents and his deposition.[17] [Jack Decl. ¶ 32 & Ex. 26.]

**K.      Cost Estimates for Conducting the Comprehensive Review**

Estimates for the costs of experts to review the data so far collected from Attariwala's devices and accounts vary but are all substantial. At the outset of this case, Attariwala claimed that certain devices would have little-to-no Singota data, but Green discovered thousands of hits of Singota data on them. *See supra* at 10.  In addition, if Attariwala wants a device or account cleansed of Singota data and returned to her (rather than simply surrendering the device or account permanently), that would increase review and remediation costs. By April 16, 2019, Green estimated review costs could exceed $100,000. *See* Doc. 4-1 at PDF Pages 230-232.  In addition, in June of 2019, Singota sought quotes from three additional vendors for reviewing the data so far collected from Attariwala, including Charles River Associates, HaystackID, and Epiq.  The estimates (in random order) were $79,660 plus additional hourly work to be determined, $99,125 to initially process data plus an undetermined amount to review it, and $385,517. (Jack Decl. ¶ 33.) On September 11, 2020, Green estimated the cost for her to review the allegedly Honey-Ji-related data demanded by Attariwala in her adversary proceeding would be over $8,525. Letter from C. Murray to D. Lynn, dated Sept. 11, 2020 at 11 (Jack Decl. ¶ 30 & Ex. 24.)

### III.      ARGUMENT

**A.      The Inspection Order should be amended.**

**1.      Legal Standards**

---

[17] Singota is filing this motion on a miscellaneous docket in the District Court for the District of Columbia because, under Rule 45, that would be the district for any motion for contempt for a failure to comply with a subpoena.  Fed. R. Civ. P. 45(c), (d). Singota sent the motion to the clerk's office on October 13, 2020. The docket is not yet open.

This Court may amend the Inspection Order at its discretion. The Inspection Order governs the parties' performance under the preliminary injunction orders and in discovery. *See* Inspection Order at p. 2 ("To effectuate the Court's PI order and to facilitate ESI discovery, the Court orders the following terms and conditions regarding the inspection of the ESI contained within the Accounts and Devices produced by Defendant."). Similarly, the State Court entered the Expenses Order as a supplement to its preliminary injunction, ordering that Attariwala pay the expenses for Phase I of Green's work under the Inspection Order. [Doc. 4-1 at 138.][18]

The Inspection Order was incorporated into the State Court's preliminary injunction. March 4, 2019 PI [Doc. 4-1 at 91] ¶ 5. This Court's preliminary injunction expressly incorporated both the State Court's preliminary injunction order and the Inspection Order. Dec. 18, 2019 PI [Doc.122] at 1 & 3. Additionally, this Court has never modified or dissolved the Expenses Order. 28 U.S.C. § 1450 (a state court's orders remain "in full force and effect" following removal unless modified or dissolved by the district court); Dec. 4, 2019 Tr. at 46:9 – 47:2 (noting Attariwala never moved to modify the Expenses Order).

---

[18] Court regularly require cost-shifting as part of a preliminary injunction where an inspection is necessary. *See, e.g.*, *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515, 2011 WL 13135653, at *13 (N.D.N.Y. Dec. 12, 2011) (in granting preliminary injunction in misappropriation of trade secrets case, ordering that "Defendants shall allow Plaintiff to inspect and perform a forensic investigation of Defendants' computer systems" and allow ongoing monitoring "at Defendants' sole cost and expense"); *PLC Trenching Co., LLC v. Newton*, No. 6:11-CV-0515 GTS/DEP, 2012 WL 1155963, at *5 (N.D.N.Y. Apr. 6, 2012) (finding defendants "will[l]fully violated the Preliminary Injunction" by failing to reimburse plaintiffs for costs as ordered); *Int'l Sch. Servs., Inc. v. AAUG Ins. Co.*, No. 10-62115-CIV, 2012 WL 4936054, at *9 (S.D. Fla. Oct. 17, 2012) (noting that preliminary injunction "required Defendants to pay '[t]he expenses incurred by ... any forensic accountant or forensic accounting firm' that [plaintiff] selected for "inspecting, copying, analyzing and providing" certain reports and finding defendants in contempt for failing to pay such expenses). *See also MGE UPS Sys., Inc. v. Titan Specialized Servs., Inc.*, No. 3:04-0231, 2006 WL 3524502, at *15 (M.D. Tenn. Dec. 6, 2006) (as sanction for violating preliminary injunction, ordering defendant "to produce all of its computers for inspection by [plaintiff's] computer expert to ensure that all [of plaintiff's] software and trade secrets are removed from [defendant's] computers and harddrives" and requiring that defendant "shall pay the costs of [plaintiff's] expert's work under this Order").

To the extent the Inspection Order is a component of the Preliminary Injunction, "[t]here is no dispute that a court has the authority to modify a preliminary injunction." *Everest Nat. Ins. Co. v. Sutton*, No. CIV.A 07-722(JAP), 2010 WL 147930, at *1 (D.N.J. Jan. 8, 2010) "When modifying a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place." *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332, 340 (3d Cir. 1993). "The court is authorized to make any changes in the injunction that are equitable in light of subsequent changes in the facts or the law, or for any other good reason." *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 578 (5th Cir.1974). Thus, the "purpose of the motion to modify an injunction is to demonstrate that changed circumstances make the continuation of the order inequitable." *Merrell-Nat'l Labs., Inc. v. Zenith Labs., Inc.*, 579 F.2d 786, 791 (3d Cir. 1978).

Similarly, to the extent the Inspection Order governs discovery, Rule 26(c) provides that a court may "for good cause" make "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . ." Fed. R. Civ. P. 26(c). A court may modify a discovery order at its discretion. 8A Fed. Prac. & Proc. Civ. § 2044.1 (3d ed.) (noting "as a sheer matter of power the court has authority to alter the terms of a protective order it has entered" and "ordinarily requests to modify are directed to the district court's discretion and subject to review only for abuse of discretion").

**2.**      **The Court should amend the Inspection Order to allow Green to provide copies of all data collected from accounts and devices to Singota and its counsel for their review.**

The preliminary injunctions, Inspection Order, and Expenses Order are intended, in part, to allow Singota to identify what data Attariwala copied from Singota and retained, to determine what she has done with it, and to recover Singota data from her possession, custody, and control (including from anyone working in active concert with her). Green's work under the Inspection

31

Order to comprehensively review the data collected stalled due to Attariwala's refusal to comply with the Expenses Order and pay Green's expenses. As a result, much of the data Green has collected has not yet been comprehensively reviewed under the Inspection Order's protocols.

At the same time that Attariwala has obstructed Green's analysis under the Inspection Order, Attariwala has sued Green in bankruptcy court seeking the return of some of her data and has served a burdensome subpoena on Green seeking the production of data and documents from Green. In doing so, Attariwala obviously seeks to circumvent the Preliminary Injunction, Inspection Order, and Expenses Order. Moreover, Green, an innocent third-party professional, is being burdened by the need to respond to Attariwala's suit against her in bankruptcy court and the need to object (and potentially respond) to Attariwala's subpoena. To date, Attariwala has failed to compensate Green for her work responding to Attariwala's demands to turn over allegedly Honey-Ji-related data in the bankruptcy case, to defend the adversary proceeding Attariwala has filed against Green, or to respond to the subpoena Attariwala served on Green in this case.

To add insult to injury, Green has already provided (with Singota's consent) a copy of the data she had collected from Attariwala's accounts and devices as of September 9, 2019, *to Attariwala's former counsel. See supra* at 19-20. Attariwala's former counsel thus had the ability to directly search and review Attariwala's data for relevant evidence and for Singota's property while Singota and its counsel still do not.[19]

---

[19] After Attariwala's Indiana counsel withdrew their appearance, they provided a copy of the data Green had produced to them on September 9, 2019, to Attariwala's bankruptcy counsel, David Lynn. This was improper. Green produced the data to Attariwala's Indiana counsel designated as "attorneys-eyes-only" under the protective order in this case. *See* Email from R. Green to P. Jefferson et al., dated Sept. 9, 2019 (Jack Decl. ¶ 16 & Ex. 13). That protective order allows confidential and AEO materials to be shared only with, among others, "[c]ounsel of record for any party *in this action*" and to be used only in *this* litigation. Doc. 26 ¶¶ V(A); V(B)(3); V(C)2 (emphasis added). Lynn is not representing Attariwala in this action and is not subject to this Court's Stipulated Protective Order. It is unclear whether Attariwala's Indiana counsel required Lynn to execute Attachment A to the protective order before providing the AEO-designated data to him. *See* Doc. 26 at p. 13 ("Agreement to be Bound by Protective Order"). If so, they have not provided it to Singota despite its request. *See* Correspondence between counsel, dated Apr. 16, 2020; Apr. 28, 2020 & May 7, 2020 Jack Decl. ¶ 36 & Ex. 29). Following Singota's objection, Attariwala's former counsel

If Singota were required to advance the costs for Green's comprehensive review of all accounts and devices so far collected in light of Attariwala's refusal to pay Green, Singota would incur a hundred thousand dollars in additional expert fees at least *just to obtain the identification and return of its own misappropriated data*. That would be unjust and unfair to Singota, especially in view of the significant expert fees and attorneys' fees it *has already incurred due to Attariwala's misconduct and contempt*. *See* PI Order [Doc. 121] at 29 ("It has taken months of forensic expert analysis (and, to date, $170,000 in expert fees) to uncover the extent of Ms. Attariwala's theft.")

Finally, due to Attariwala's decision to proceed *pro se*, Green would be unable to produce Singota's recovered data back to Singota under the Inspection Order in its current form in any event. The existing protocol requires Green first to provide files to Attariwala's *counsel*, who will be "given three (3) days to review those files . . . for the Defendant's personal information" before Green produces the files to Singota's counsel. Inspection Order at ¶¶ 24 & 26. But Attariwala no longer has counsel. Under no circumstances can Green produce Singota's confidential and trade-secret data back to Attariwala, herself, for review under the Inspection Order's protocol, since she is prohibited from possessing such data under the preliminary injunction and the Stipulated Protective Order. *See* Dec. 17, 2019 PI [Doc. 122 at 2] (ordering that Attariwala continues to be enjoined from "possessing, transmitting, using, copying, or disclosing to others Singota's confidential information or trade secrets").[20] Thus, under the current Inspection Order, it is unclear how Singota could ever get back its own data from Attariwala's accounts and devices.

---

represented that they terminated Lynn's electronic access to the Green-produced AEO data and that Lynn claims he did not download or review that data. *See* Letter from Cynthia A. Bedrick to C. Murray, dated June 2, 2020 (Jack Decl. ¶ 34 & Ex. 27). Singota cannot confirm these representations.

[20] Attariwala now claims that she has a right to directly receive confidential documents designated attorneys-eyes-only since she no longer has counsel. *See* Email from J. Attariwala to C. Murray, dated Oct. 20, 2020 (Jack Decl. ¶ 35 & Ex. 28.) Attariwala is wrong. Both the stipulated protective order and the preliminary injunctions prohibit her from possessing Singota's AEO-designated confidential and trade-secret documents. Courts regularly find in trade secret cases that *pro se* parties are reasonably prohibited under attorneys-eyes-only requirements from receiving highly confidential and trade-secret information in discovery even though "AEO" requirements may prevent the *pro se* party

These facts demonstrate good cause for the Court to modify the Inspection Order to allow Green to provide copies of the data she had collected from accounts and devices to Singota to allow it and its counsel to search for Singota's misappropriated data. Due to Attariwala's refusal to pay Green's expenses, Green has not completed this work under the Inspection Order. Amending the Inspection Order in this way will allow Singota to search for its data directly and without incurring tens or hundreds of thousands of dollars in additional experts' fees or attorneys' fees that Attariwala was ordered to pay.

This amendment will also advance discovery in this case. Singota served discovery requests on Attariwala seeking, among other things, her production of all documents relating to Singota that Attariwala obtained from Singota. [Doc. 4-1 at PDF Pages 73.] Attariwala claimed she could not respond to this discovery because the relevant data was in Green's possession. *See supra* at 19. Even after Green provided copies of all of the data she had so far collected to Attariwala's former counsel on September 9, 2019, Attariwala never supplemented her responses

---

from directly accessing relevant evidence. *See, e.g., Cherdak v. Koko Fitclub*, LLC, No. CIV.A. 14-10371-IT, 2015 WL 1895992, at *2 (D. Mass. Apr. 27, 2015), aff'd, No. 14-CV-10371-IT, 2015 WL 3505259 (D. Mass. June 3, 2015) (finding that "it would be inequitable to allow [*pro se* plaintiff] access to the highly confidential information belonging to the defendants because he elected to proceed *pro se*" and noting that "nothing herein prevents plaintiff from retaining the services of an outside attorney to help him prepare his case"); *Medina v. Microsoft Corp.*, No. 14-CV-00143-RS (JSC), 2014 WL 3884506, at *2 (N.D. Cal. Aug. 7, 2014) (rejecting *pro se* party's objection to attorneys-eyes-only provision in court's standard protective order for trade secrets and noting the order's AEO "rule would lack any teeth if all a person had to do to get access to a company's highly confidential information is to bring suit without being represented by an attorney."); *RPA Intern. Pty Ltd. v. Compact Intern., Inc.*, 2007 WL 4105725, *2-*3 (S.D. Cal. Nov. 2007) (denying *pro se* defendant's motion to modify stipulated protective order to permit him to have access to plaintiff's attorneys-eyes-only confidential information where the court could not "definitively conclude that Defendant Soo lacks the necessary resources to hire an attorney who can review the information subject to the Protective Order" and, in any event, the "great potential harm of disclosing Plaintiffs' trade secrets directly to Defendant Soo, a competitor, outweighs Defendant Soo's claimed need for the information"); *Schlafly v. Public Key Partners*, C 94-20512 SW(PVT) (N.D. Cal. July 19, 1995) (finding that a protective order that prohibited a *pro se* plaintiff from receiving certain confidential information was appropriate, even though it would require the plaintiff to retain counsel or an independent expert to review that information); *Levine*, 226 Ct. Cl. 701, 705 (1981) (affirming denial of *pro se* party's access to attorneys-eyes-only evidence and noting that "if any designated materials are truly as critical to his cause as Levine claims, he may retain counsel to review any designated materials for him").

34

to Singota's discovery. If Singota's proposed amendment is granted, Singota will be able to search

itself for documents responsive to its discovery requests in the data collected by Green.

**B.**     **Any objections Attariwala might make to amendment of the Inspection Order should be deemed waived as a sanction for her willful contempt of court orders.**

    **1.**     **Legal Standards**

"Courts have the power, and the responsibility, to advance the orderly and expeditious

disposition of a case." *Novelty, Inc. v. Mountain View Mktg., Inc.*, 265 F.R.D. 370, 374 (S.D. Ind.

2009), clarified on denial of reconsideration, No. 107CV01229SEBJMS, 2010 WL 11561280

(S.D. Ind. Jan. 29, 2010). "When a party flouts a Court's authority to do so, the Court may take

action, under either its inherent powers or by virtue of the Federal Rules of Civil Procedure." *Id.*

As this Court explained in *Novelty*:

> "Because of their very potency," courts generally must exercise "restraint and
> discretion" before exercising their inherent powers to sanction parties—or their
> counsel—for misconduct. *Chambers,* 501 U.S. at 44–45, 111 S.Ct. 2123.
> However, the more serious the misconduct to be sanctioned, the more extensive the
> range of options available to the Court. *See United States v. Johnson,* 327 F.3d 554,
> 563 (7th Cir.2003) ("Generally, the harshest of sanctions based on inherent powers
> have been upheld only in situations involving bad faith, contumacy, or egregious
> misconduct. Conversely, misconduct that is merely questionable warrants a less
> severe sanction ...." (citations omitted)). Punitive sanctions, such as an assessment
> of attorney's fees, require a finding of willfulness or bad faith, as do sanctions
> against counsel. *Maynard v. Nygren,* 332 F.3d 462, 470–71 (7th Cir.2003).
> Remedial sanctions, however, do not require such a showing. *See Johnson,* 327
> F.3d at 563 (affirming disgorgement of fees under inherent authority without
> finding of bad faith).

*Id.* at 374.

Similarly, Rule 37 authorizes sanctions when "a party ... fails to obey an order to provide

or permit discovery." Fed. R. Civ. P. 37(b)(2)(A). A sanction under Rule 37 requires a showing of

"willfulness, bad faith, or fault." *Am. Nat'l Bank & Trust Co. v. Equitable Life Assur. Soc'y of the*

*U.S.*, 406 F.3d 867, 878 (7th Cir.2005) (quotation omitted). "For purposes of that section, 'fault'

concerns itself with 'the reasonableness of the conduct—or lack thereof—which eventually culminated in the violation.'" *Novelty*, 265 F.R.D. at 374.

Courts may sanction a party for willfully violating a court order by ordering that the party has waived its attorney-client privilege and work-product protections. *See, e.g.*, *Novelty*, 265 F.R.D. at 381-82 ("[g]iven the abundant and uncontroverted evidence of Novelty's cavalier and callous disregard toward the Court's orders and the discovery rules," finding that Novelty "waived any discovery privileges that it might have otherwise properly asserted over" certain documents); *Muro v. Target Corp.*, 250 F.R.D. 350, 365 (N.D. Ill. 2007) ("An order that privileged documents be disclosed as a sanction is appropriate ... if the party that authored the log has displayed willfulness, bad faith or fault."); *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 336 (N.D. Ill. 2001) (holding plaintiff's "[m]otion is granted as to all documents that [defendant] is withholding on the basis of attorney-client privilege" due to defendant's unjustified, inexcusable, and bad faith disregard of discovery rules).

### 2.   Attariwala should be deemed to have waived any privileges or protections she might assert with respect to the data collected by Green.

Singota anticipates that Attariwala may object to Singota's proposed amendment to the Inspection Order on the ground that Green's providing copies of data she collects from accounts and devices to Singota and its counsel for review could invade her privacy, including with respect to potentially confidential, privileged, and otherwise protected communications. If Attariwala raises any such objections, they should be deemed waived based on her willful contempt and bad-faith conduct.

To attempt to balance Singota's and Attariwala's interests, the Inspection Order created a protocol under which Attariwala, through her former counsel, could review data before Green produced it to Singota to allow Attariwala's counsel to identify any of Attariwala's "personal and

confidential" information that should not be disclosed and to create a log. *See* Inspection Order ¶¶ 24-26. However, Attariwala has refused to comply with the Expenses Order requiring her to pay for Green's work under the Inspection Order. As a result, Green's work reviewing data for production to Singota ceased. Attariwala repeatedly refused to replenish Green's retainer so she could continue her work, ignored the State Court's April 16, 2019 Order that she immediately pay Green $15,000, and ignored the State Court's oral order on April 17, 2019 that she either produce outstanding accounts and devices or deposit $55,000 with the clerk's office to fund Green's work. Throughout this time period, as Attariwala's recently produced bank statements show, she had ample funds available to pay Green. *See supra* at 15-18. Indeed, since April 16, 2019 (when the State Court ordered Attariwala to immediately pay Green $15,000 to continue her work), Attariwala has paid her various attorneys over $80,000 rather than make a single additional payment to Green. *Id.*[21] Even after this Court pointed out at the December 4, 2019 hearing that Attariwala was in default of the Expenses Order, Attariwala failed to comply with it.

At the same time that Attariwala has willfully violated the Expenses Order and brought Green's work under the Inspection Order to a halt, Attariwala is attempting to circumvent this Court's preliminary injunction by directly suing Green in an adversary proceeding seeking the turnover of certain data and by serving Green with a burdensome subpoena seeking the production of documents and data.

In light of Attariwala's longstanding and open contempt of the Expenses Order, her obstruction of Green's work under the Inspection Order, and her recent attempts to circumvent the preliminary injunctions, Attariwala should be deemed to have waived whatever benefits and

---

[21] Although Attariwala filed bankruptcy, her retirement accounts still contain over $140,000 in funds, which Attariwala represented in the bankruptcy court she was willing to use, if necessary, to fund her Chapter 13 plan. *See supra* at 18-19. She has never used those funds to meet her obligations in this Court. And Attariwala was already in contempt of the Expenses Order in this Court prior to filing her bankruptcy on December 17, 2019.

protections the Inspection Order offers for her own benefit, including, in particular, the opportunity to review data for her "personal and confidential" information before it is produced to Singota. To the extent, if any, data collected by Green contains Attariwala's privileged, protected, or personal and confidential information, the Court should find as an appropriate sanction that Attariwala has forfeited any applicable privileges and protections, at least to the extent they might otherwise bar Green for providing copies of all of the data she collects to Singota and its counsel for review.[22]

Finally, in light of Attariwala's ongoing contempt and bad-faith misconduct as outlined above, this Court should enter additional sanctions against Attariwala, including ordering her to reimburse Singota for its attorneys' fees and costs in making this motion and to reimburse both Singota and Rebecca Green their attorneys' fees, professional fees, and costs in responding to Attariwala's adversary proceeding filed against Green seeking the turn-over of data in violation of this Court's Preliminary Injunction and in responding to Attariwala's subpoena to Green seeking the production of documents and data. This Court has already found that it may issue sanctions against Attariwala for litigation misconduct without violating the automatic stay under 11 U.S.C. § 362. *See* Order, dated Apr. 20, 2020 [Doc. 196] at 8-11 & n. 10. Moreover, the bankruptcy court has lifted the automatic stay to allow Singota to liquidate it damages, including to pursue "all other possible relief against her, including injunctions, sanctions, and any other relief deemed appropriate by the Indiana court, to final judgment or resolution." *See* Order Granting Motion for Relief from Automatic Stay to Permit Liquidation of Damages Claims [Bankr. Doc. 88] at 1-2, attached as **Exhibit E**.

---

[22] Singota would not object to treating all non-Singota data and documents contained in the data turned over by Green to Singota and its counsel for review as confidential under the existing protective order.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Singota respectfully moves the Court:

- to order that the March 4, 2019 Agreed Order for Inspection of Computers and Electronic Information Storage Devices ("Inspection Order") [Doc. 4-1 at 97] is amended to allow Rebecca Green to provide to Singota and its counsel all data that she collects or has collected from any and all accounts and devices covered by the Inspection Order, the March 4, 2019 Stipulated Preliminary Injunction entered by the Monroe Circuit Court ("March 4, 2019 PI") [Doc. 4-1 at 91], and this Court's Preliminary Injunction dated December 18, 2012 [Doc.122];

- to order that Attariwala has engaged in willful contempt of the March 18, 2019 Supplemental Order Following Preliminary Injunction ("Expenses Order") [Doc. 4-1 at 138], the Inspection Order, the preliminary injunctions, and the April 16, 2019 Order Granting Motion to Show Cause Why Defendant Should Not Be Found in Contempt [Doc. 4-1 at PageID # 411] by refusing to pay for Rebecca Green's work under those orders and by attempting to circumvent those orders to attempt to obtain the return of data from Green outside the scope of the Inspection Order;

  - to order that as a sanction for such willful contempt Attariwala has waived any objection based on any claim of privilege, other protection, or confidentiality to Green's providing data collected from any and all accounts and devices covered by the Inspection Order to Singota and its counsel for their review;

  - to order as additional sanctions that Attariwala must reimburse Singota for its attorneys' fees and costs in making this motion and to reimburse both Singota and Rebecca Green their attorneys' fees, professional fees and expenses, and costs in

39

responding to Attariwala's adversary proceeding filed against Green and in responding to Attariwala's subpoena to Green seeking the production of documents and data, including compensating Green at her ordinary professional rates for such work; and

- to award Singota and its expert, Green, such other relief as the Court deems just and proper.

Respectfully submitted,

_/s/  Christopher C. Murray_
Christopher C. Murray, Atty. No. 26221-49
Justin A. Allen, Atty. No. 31204-49
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
111 Monument Circle, Suite 4600
Indianapolis, Indiana  46204
Telephone:  317.916.1300
Facsimile:  317.916.9076
_christopher.murray@ogletree.com_
_justin.allen@ogletree.com_

Attorneys for Plaintiff/Counter-Defendant
BioConvergence, LLC d/b/a Singota Solutions

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2020, a copy of the foregoing was filed electronically. Notice of this filing will be sent to any parties registered for receipt of electronic filings by operation of the Court's CM/ECF system.

In addition, I hereby certify that on October 21, 2020, a copy of the foregoing was sent by U.S. Mail first-class postage pre-paid:

Jaspreet Attariwala
1390 Kenyon St., NW Apt. 32
Washington, DC  20010

*/s/ Christopher C. Murray*

44320036.6

41